EARL DUBEY & SONS, INC v MACOMB CONTRACTING
CORPORATION

Docket No. 44894. Submitted March 5, 1980, at Lansing.—Decided
May 20, 1980. Leave to appeal applied for.

Earl Dubey & Sons, Inc., and its insurer Sentry Insurance Com-
pany received a judgment against Macomb Contracting Corpo-
ration for breach of contract on a highway construction project
and, pursuant to that judgment, served a writ of garnishment
on the State of Michigan. The State Treasurer disclosed indebt-
edness to Macomb and issued a warrant in payment of the
indebtedness. Travelers Indemnity Company, Macomb's surety,
and the Western Bank of Houston, Texas, which held a security
interest in "all property and assets" of Macomb, notified the
State Treasurer of their claims to the garnished funds. The
State Treasurer stopped payment on the warrant and deposited
the funds with the circuit court. Dubey and Sentry filed a
motion for turnover of the funds and Travelers and Western
Bank filed a motion for summary judgment. The Macomb
Circuit Court, Robert J. Chrzanowski, J., ordered the funds
turned over to Dubey. Travelers and Western Bank appeal.
*Held:*

1. Dubey's rights to the funds attached as of the date of
service of the writ of garnishment. The date of default, which is
the date on which Travelers became obligated to perform on its
surety bond, was after the service of the writ. Therefore,
Travelers may not recover under a theory of subrogation,
because it had not been called upon to expend any funds for
completion of the project until after the garnishment.

2. The fact that the state stopped payment on its warrant is
not determinative of the parties' rights. The payment was
stopped because of the actions of Travelers and Western Bank

REFERENCES FOR POINTS IN HEADNOTES
[1-4]17 Am Jur 2d, Contractors' Bonds §§ 42, 107-109, 111-113.
[2] 73 Am Jur 2d, Subrogation § 46.
[5] 13 Am Jur 2d, Building and Construction Contracts § 130.
[6] 68 Am Jur 2d, Secured Transactions § 172 *et seq.*
[7] 69 Am Jur 2d, Secured Transactions § 479.

and their actions in bringing about the stop payment may not now serve as the basis for a successful claim to the funds.

3. The builders' trust fund act, which establishes a trust fund for the benefit of laborers and materialmen, does not apply to public, as opposed to private, construction projects.

4. The money held by the state is within the Uniform Commercial Code's definition of an account, and pursuant to the security agreement between Macomb and Western Bank, Western Bank has an interest in Macomb's accounts. Because that security interest was perfected prior to service of the writ of garnishment Western Bank's interest is superior to that of Dubey, a lien creditor.

Reversed.

1. SURETYSHIP AND GUARANTEE — DEFAULT — ASSUMPTION OF OBLIGATION.

A surety of a contractor on a construction project is entitled to receive funds owed by the owner upon the assumption of a financial obligation in completing the project after the default of the contractor.

2. SUBROGATION — ACCRUAL OF RIGHT — PAYMENT OF DEBT.

The right to subrogation accrues upon payment of the debt.

3. SURETYSHIP AND GUARANTEE — DEFAULT — DECLARATION OF DEFAULT.

No formal declaration of default is required in order to entitle a surety to prevail over competing creditors of a defaulting contractor; it is necessary only that the contractor be in default in fact and that the surety be obligated under its bond to perform.

4. SURETYSHIP AND GUARANTEE — DEFAULT — NOTICE OF DEFAULT.

The date of notice of default of a contractor is the proper date for determining the rights of creditors and sureties where there is no evidence of an actual default requiring payments by the contractor's surety prior to the date of formal acknowledgement.

5. STATUTES — BUILDERS' TRUST FUND ACT — PRIVATE CONSTRUCTION PROJECTS.

The builders' trust fund act applies only to private, not public, construction projects (MCL 570.151; MSA 26.331).

6. SECURED TRANSACTIONS — WORDS AND PHRASES — ACCOUNTS — STATUTES.

Money held by the state and reserved for progress payments to a

contractor on a highway construction project is within the Uniform Commercial Code's definition of an "account" (MCL 440.9106; MSA 19.9106).

7. Secured Transactions — Lien Creditors — Statutes.

An unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected; conversely, one who becomes a lien creditor after another's security interest is perfected is subordinate to that perfected security interest (MCL 440.9301; MSA 19.9301).

*Tolley, Fisher & Verwys,* for plaintiffs.

*Jenkins, Nystrom & Sterlacci, P.C.* (by *Ronald A. Deneweth),* for Travelers Indemnity Company and Western Bank of Houston, Texas.

Before: M. J. Kelly, P.J., and D. F. Walsh and Beasley, JJ.

M. J. Kelly, P.J. Plaintiffs Earl Dubey & Sons, Inc. and Sentry Insurance Company brought this action against defendant Macomb Contracting Corporation seeking rescission and restitution for breach of contract. A judgment was entered in favor of plaintiffs on April 26, 1976, which was subsequently affirmed by this Court. *Earl Dubey & Sons, Inc v Macomb Concrete Corp,* 81 Mich App 662; 266 NW2d 152 (1978), *lv den* 403 Mich 811 (1978), *cert den* 441 US 944; 99 S Ct 2163; 60 L Ed 2d 1046 (1979). Pursuant to the judgment plaintiffs served a writ of garnishment upon defendant State of Michigan. See GCR 1963, 738. The State Treasurer disclosed indebtedness to Macomb Contracting Corporation in the amount of $110,010.74.

Intervening defendant Travelers Indemnity Company, Macomb's payment and performance bond surety, and intervening defendant Western Bank, which held a security interest in "all property and assets" of Macomb, made claim to the

funds that were the subject of the garnishment. Due to these conflicting claims the State of Michigan deposited the funds with the circuit court, pending the court's determination as to which party was entitled to the funds. Plaintiffs filed a motion for turnover of the funds; Travelers and Western Bank filed a motion for summary judgment.

A hearing was held on the above motions on March 5, 1979. An opinion and order was entered directing the turnover of the funds to plaintiff Earl Dubey & Sons, Inc. On April 17, 1979, an order was entered denying the intervening defendants' motion for rehearing and affirming the grant of plaintiffs' motion for turnover. Intervening defendants (hereinafter "defendants") appeal as of right.

The dates on which several events occurred are crucial to the outcome of this case. On March 13, 1978, Western Bank filed with the Michigan Secretary of State in Lansing a financing statement reflecting its security agreement with Macomb. Western also recorded a financing statement covering all present and after-acquired assets and property of Macomb with the Macomb County Register of Deeds on March 27, 1978. Plaintiffs served a writ of garnishment upon the State of Michigan on July 31, 1978. On August 18, 1978, Macomb formally acknowledged its default to the State of Michigan on the Southfield Freeway construction project. On the same date the State Treasurer filed its first amended disclosure indicating its $110,010.74 indebtedness to Macomb and enclosed a warrant payable to it or the clerk of the Macomb County Circuit Court. On August 23, 1978, attorneys for Travelers and Western Bank sent a telegram to the State Treasurer and made claim to the garnished funds as surety and as a secured party, respectively. Before the proceeds of the

warrant were paid to plaintiffs, the Department of Treasury stopped payment and notified plaintiffs' counsel of the action and sought to have the circuit court resolve the conflicting claims to the funds.

Defendants submit that the trial court erred in ruling that service of the writ of garnishment upon the State of Michigan prior to Macomb's acknowledgment of default precluded defendants' claim of right to the funds held by the state. As defendants point out, we are not presented here with the usual situation in which the primary lending bank (Western) and payment and performance bond surety (Travelers) are competing for state-held funds reserved for progress payments to laborers, suppliers, etc. Western and Travelers are unusually aligned on the same side in this action due to an indemnity agreement running from Travelers to Western. Travelers' claim of right to the contested funds is based upon its indemnity agreement with Macomb, a surety's right of subrogation and the builder's trust fund act, MCL 570.151; MSA 26.331.

I

On July 22, 1977, Macomb entered into a general agreement of indemnity with Travelers which states in part:

"[I]n the event of the abandonment, forfeiture or breach of the contract, or the breach of any bond given in connection therewith, or the failure, neglect or refusal to pay for labor or materials used in the prosecution of the contract, to take possession of the work under the contract and, at the expense of the Indemnitors, to complete the contract, or cause, or consent, to the completion thereof. The Indemnitors hereby assign,

transfer, and set over to the Company *(to be effective as of the date of any such bond,* but only in the event of a default as aforesaid), all of their rights under the contract, including their right, title and interest in and to all subcontracts let in connection therewith; all machinery, plant, equipment, tools and materials which shall be upon the site of the work or elsewhere for the purposes of the contract, including all materials ordered for the contract, and any and all sums due under the contract at the time of such abandonment, forfeiture, breach, failure, neglect or refusal, or which thereafter become due * * *." (Emphasis added.)

Defendants rely heavily on the above emphasized language in supporting their position that since, upon default, the assignment of contract rights relates back to the date of execution of the bond, Travelers' claim predates the date of the writ of garnishment and thus entitles them to superiority. It is equally clear from the contractual language that default, requiring completion of the project at Travelers' expense, triggers Travelers' right to claim, by assignment, Macomb's rights to those funds in the hands of the state. As of that date, as to any monies retained or coming due, Travelers would prevail over any competing creditor subsequently seeking payment whose interest attached after September 29, 1977, the date on which Travelers issued its payment and performance bonds.

Plaintiff Dubey's rights to the contested funds attached July 31, 1978, the date of service of the writ of garnishment. *Mary v Lewis,* 399 Mich 401; 249 NW2d 102 (1976). The question then becomes whether, due to Macomb's default, Travelers had incurred expenses in the completion of the project as of July 31, 1978; if so, by virtue of the relation back clause of the indemnification agreement, Travelers' interest in the funds held by the state must be elevated over plaintiff's claim. The date of

default is important as it fixes the time at which the surety was obligated to perform; it is the assumption of financial obligation in completing the construction project that entitles the surety to receive those funds owed by the state.

A number of cases, including those cited by defendants, impel the conclusion that Travelers, as performance bond surety, had no contractual rights to the funds subject to the turnover order granted plaintiff because, as of the date of plaintiff's writ of garnishment, Travelers was not obligated to perform under its surety contract. *E.g., R C Mahon Co v R S Knapp Co,* 268 Mich 67, 70; 255 NW 453 (1934), *Gray v Travelers Indemnity Co,* 280 F2d 549 (CA 9, 1960). If in fact, Travelers had become so obligated, then either under the terms of its indemnification agreement with Macomb or under equitable subrogation principles its rights would be superior to plaintiffs'. The right to subrogation accrues upon payment of the debt. "The doctrine of relation back cannot be used by the subrogee for the purpose of recovering money paid to persons having no notice, in satisfaction of just claims, prior to the maturing of the right to subrogation." 83 CJS, Subrogation, § 14, p 613.

Defendants argue that Macomb was in default prior to the date of the writ of garnishment and that the trial court erred in accepting the date of Macomb's formal declaration of default as the key date for establishing the rights of the parties. We agree with the trial court that under the facts of this case the date of default and thus the date that Travelers became obligated to perform as surety was August 28, 1978.

The precise time of default is determined by the facts in each case. In order for the surety to prevail over competing creditors it is necessary

that the contractor be in default as a matter of fact, and that the surety be obligated under its bond to perform; no formal declaration of default is required. *Travelers Indemnity Co v West Georgia National Bank,* 387 F Supp 1090 (ND Ga, 1974). In *First Alabama Bank of Birmingham v Hartford Accident & Indemnity Co, Inc,* 430 F Supp 907 (ND Ala, 1977), the court held that the completing surety was entitled to the funds it received from the owner even though the contractor was still working and had not acknowledged default. Despite the absence of formal acknowledgment, the contractor had requested that the surety assume payments to unpaid subcontractors and suppliers. This procedure was agreed upon at a meeting between contractor, surety, and owner. The surety performed in accordance with this agreement and therefore was the proper recipient of project monies from the owner since the contractor was in default as a matter of fact.

The Fifth Circuit Court of Appeals reached a different result in *Fidelity & Deposit Co of Maryland v Scott Brothers Construction Co,* 461 F2d 640 (CA 5, 1972). The contractor's formal declaration of default was deemed the operative fact due to the absence of evidence of actual default prior to formal notice. Although *Scott* deals with the more common dispute between surety and lending bank, the reasoning is equally applicable here in establishing priority among competing claimants:

"The District Court, in resolving the issue, correctly perceived and followed the *distinction between, on the one hand, retainages and earned but unpaid progress payments and, on the other hand, progress payments that already have been paid before the contractor defaults. As to the former category of contract funds a surety enjoys a claim superior to that of an assignee*

*bank, whereas the bank's rights take priority of the surety's as to contract payments made before default.* (Citations omitted.)

"The distinction reflects the theory that a surety 'is not only a subrogee of the contractor, * * * but also a subrogee of the [owner] and entitled to any rights the [owner] has to the retained funds.' *Trinity Universal [Ins Co v United States,* 382 F2d 317 (CA 5, 1967)], *supra,* 382 F2d at 320. 'But for the surety's completion of the work, the obligee on the bond, be he owner or prime contractor, would have been entitled to apply the funds against the cost of completion. *It is the surety's performance which frees the funds, and, * * * the surety is entitled to them.'* *American Fire & Cas Co v First National City Bank of NY,* 411 F2d 755, 758 (1st Cir, 1969). *See also Lloyd Wood Construction Co v Con-Serv, Inc,* 285 Ala 409, 232 So 2d 649, 654-655 (1970). Any payments made by the owner prior to default, however, are attributable to the contractor's performance, not the surety's, and the owner, to whom the surety becomes subrogated, may not rightfully withhold such payments so long as the contractor is in material compliance with its obligations under the contract. *American Cas Co of Reading, Pa v Line Materials Indus,* 332 F2d 393, 395 (10th Cir, 1964).

* * *

"What matters, however, is that F & D had no obligation to begin performance under its bond with Scott, and thus no rights to contract payments as subrogee, until Scott either stated that it could no longer continue on the job or until Scott materially failed in its performance." 461 F2d 642-643. (Emphasis added.)

In the instant case we have no evidence of actual default, *i.e.,* payments made by the surety, prior to the date of formal acknowledgment; therefore, as in *Scott, supra,* the date of notice is the proper date in determining rights of the parties. A letter from Mr. John Woodford, Director of the Michigan Department of State Highways and

Transportation, dated August 25, 1978, addressed to the manager of the surety division of Travelers and to the president of Macomb, signalled the date of default as August 18, 1978, and called upon Travelers as surety to complete the highway construction project in accordance with the terms of its bonded undertaking. The letter further stated that all contract funds were being held available for the surety for completion of the job. The affidavit of Mr. Richard Seaman, assistant manager of Travelers' surety division, noted that as of February 23, 1979, a substantial sum was spent by Travelers in the process of completing the Southfield Freeway project and that there remained a sum of $226,179.83 to be paid to Travelers upon full and final completion of the project. We find no indication that any of the listed expenses were incurred prior to July 31, 1978. Since the right to subrogation accrues on payment of the debt, Travelers' argument is without merit.

## II

Now, we address the argument that payment was not made to plaintiffs herein due to the fact that the state stopped payment on the warrant after being advised of the present contest. Even accepting defendants' argument that payment could not be effected until the warrant was honored by plaintiffs, the prevention resulted solely from defendants' intervention. Their own conduct in bringing about the stop payment order cannot now serve as the basis for a successful claim to the challenged funds. The fact remains that plaintiffs garnished the funds held by the state, thereby fixing the point in time of the legal claim to those particular funds, and that the state issued a warrant establishing the validity of the claim and

authorizing payment. Defendants' interference
with the procedure wherein plaintiffs would cer-
tainly have honored the warrant in satisfaction of
the debt has no effect on the above analysis per-
taining to accrual of subrogation rights and rights
under the indemnification agreement. When Ma-
comb acknowledged default and Travelers was
subsequently called upon to perform its bonded
obligation, it was entitled under both its indemnifi-
cation agreement and principles of subrogation to
all retainages and sums to be allocated for future
progress payments. Proceeds of the warrant issued
to satisfy debts incurred prior to that time cannot
now provide the source of payment to Travelers.

## III

We also reject defendants' argument that by
virtue of the builders' trust fund act, MCL 570.151;
MSA 26.331, the payments due Macomb were
encumbered by a trust for the benefit of the labor-
ers and materialmen who were and are being paid
by Travelers. Although defendants correctly state
the purpose of the act, the Supreme Court has
clearly ruled that it is inapplicable to public, as
opposed to private, construction projects. *National
Bank of Detroit v Eames & Brown, Inc,* 396 Mich
611; 242 NW2d 412 (1976). Although the Sixth
Circuit Court of Appeals recently ruled to the
contrary in *Parker v Klochko Equipment Rental
Co, Inc,* 590 F2d 649 (CA 6, 1979), we believe Judge
Lively's dissent correctly sets forth the law of
Michigan:

"This court decided but one question in *General
Insurance Company [of America v Lamar Corp,* 482 F2d
856 (CA 6, 1973)]—that the Michigan builders' trust act
does not apply to public projects. This decision was

based upon a careful analysis of Michigan law which I consider sound.

"The majority opinion states, 'Michigan courts have not been called upon to rule upon the question of the applicability of the statute in the context of a public construction project.' This may be literally true. However, in *National Bank of Detroit v Eames & Brown, Inc*, 396 Mich 611, 242 NW2d 412 (1976), the Supreme Court of Michigan quoted Judge McCree's language from *General Insurance Company* in describing the purpose of the builders' trust fund act. 396 Mich at 619-20, 242 NW2d at 415-16. The Michigan court, after summarizing several of its own holdings then stated:

" 'The purpose of the Act is to create a trust fund for the benefit of materialmen and others under *private* construction contracts. 396 Mich at 622, 242 NW2d at 417.' (Emphasis added.)

"I can perceive no valid reason or authority for departing from a holding of this court subsequently approved by the highest court of Michigan in a matter clearly controlled by Michigan law. I would affirm the judgment of the district court insofar as it holds that the Michigan builders' trust fund act has no application to public construction projects." 590 F2d 654.

## IV

With respect to intervening defendant Western Bank's claim to the contested funds, we find that under the priority provisions of the Uniform Commercial Code its interest is superior to that of plaintiffs. Although the record does not include the security agreement between Western and Macomb, a copy of the filed financing statement indicates Western's interest in all property and assets of Macomb, including accounts. The money held by the state, reserved for progress payments to Ma-

comb, clearly falls within the UCC's definition of an account:

" 'Account' means any right to payment for goods sold or leased or for services rendered which is not evidenced by an instrument or chattel paper whether or not it has been earned by performance." MCL 440.9106; MSA 19.9106.

Defendants contend that since Western Bank perfected its security interest prior to the date that plaintiffs achieved lien creditor status[1] by judgment and writ of garnishment Western should prevail. MCL 440.9301; MSA 19.9301 provides in part:

"(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of:

\* \* \*

"(b) A person who becomes a lien creditor before the security interest is perfected."[2]

Conversely, one who becomes a lien creditor after another's security interest is perfected is subordinate to that perfected security interest. *Rocky Mountain Ass'n of Credit Management v Hessler Mfg Co*, 553 P2d 840 (Colo App, 1976), *Walker Bank & Trust Co v Smith*, 501 P2d 639 (Nev, 1972). A recent amendment to the code, though

---

[1] "Lien Creditor" is defined at MCL 440.9301(3); MSA 19.9301(3):

"A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like \* \* \*."

[2] This version of the UCC became effective January 1, 1979. The 1964 version reads as follows:

"(b) A person who becomes a lien creditor without knowledge of the security interest and before it is perfected."

Our inquiry is not affected by the amended portion of this provision.

not in effect at the time this dispute arose,[3] confirms defendant's position:

"*A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest* only to the extent that it secures advances made before he becomes a lien creditor or within 45 days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien." MCL 440.9301(4); MSA 19.9301(4). (Emphasis added.)

Western Bank perfected its security interest in Macomb's accounts approximately four months prior to the date of plaintiff's service of the writ of garnishment.

Whether Macomb's default occurred before or after service of the writ is immaterial. It is correctly argued that until default is a reality the secured party cannot claim possession or otherwise assert rights in the collateral securing the loan, MCL 440.9501; MSA 19.9501; however, another creditor who subsequently perfects an interest in the same collateral takes that security *subject to* the interest of the first secured party. When Macomb did default in its payments to Western Bank, Western appropriately pursued its remedy under the UCC by seeking discharge of Macomb's obligation via the collateral (accounts). To deprive Western of its priority status would contravene the express provisions and purpose of the Uniform

---

[3] "Except as provided in subsection (1) [dealing with filing of continuation statements], transactions validly entered into before the effective date of this amendatory act and the rights, duties and interests flowing from them remain valid thereafter and may be terminated, completed, consummated, or enforced as required or permitted under the provisions of the uniform commercial code repealed or amended by the provisions of this amendatory act." MCL 440.11102; MSA 19.11102.

In any event, Western had completed its advancement of funds as of May, 1978, two months before plaintiffs became lien creditors.

Commercial Code. Plaintiffs' interest in Macomb's accounts is second in time and right to that of Western Bank; therefore, the order granting turn-over of the funds to plaintiffs is reversed.

Reversed.