**In re V. PANGORI & SONS, INC. Debtor.**

**Bankruptcy No. 78–60231.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Oct. 1, 1985.

Jeffrey A. Chimovitz, Flint, Mich., for Creditor Michigan Nat. Bank-Mid Michigan.

Paul A. Callam, Southfield, Mich., for Continental Cas. Co.

Raymond C. June, Flint, Mich., for David Cuvrell, Trustee.

## MEMORANDUM OPINION REGARDING MOTION OF CONTINENTAL CASUALTY CO. TO VACATE ORDER OF JANUARY 9, 1980

ARTHUR J. SPECTOR, Bankruptcy Judge.

### I. FACTS

The events giving rise to this matter are undisputed. On March 21, 1977, the bankrupt, V. Pangori & Sons, Inc., contracted with the City of Sterling Heights, Michigan, for the construction of a sanitary sewer. At the same time, Pangori obtained performance and payment bonds from Continental Casualty Co. as required for all public contracts in Michigan by the Michigan Public Contractors Bond Act, Mich. Comp.Laws § 129.201, *et. seq.* Prior to the establishment of these bonds, the bankrupt had executed a general agreement of indemnity with Continental, under which Pangori agreed to indemnify and hold Continental harmless from all claims or payments which the surety might make pursuant to bonds established on Pangori's behalf. Construction of the project did not go as planned. Pangori encountered significant and unanticipated costs and delays in performing the excavation and installation of the new sewer system. As a result of these and other difficulties, Pangori was unable to pay various suppliers and subcontractors. Progress on the project slowed to a halt, and on June 7, 1978, the city notified Pangori that its contract was terminated. At the time the project was terminated, most of the work had been done, save for clean-up, restoration and grading of the property disrupted by the project. When the debtor filed bankruptcy relief, there were material invoices, in excess of $30,000, which were more than 30 days past due. At no time prior to Pangori's filing in bankruptcy did any supplier or subcontractor make demand on the surety for payment.

On June 9, 1978 (two days after the termination of the contract) Pangori filed a voluntary petition under Chapter XI of the Bankruptcy Act and an operating receiver was appointed on June 11, 1978. In an attempt to obtain working capital which would enable it to complete various projects, including clean-up on the Sterling Heights project, the Chapter XI receiver sought a loan from Michigan National Bank. The bank agreed to loan $35,000 if it received first priority status. Pursuant to an *ex parte* motion by the receiver, the

**714**

Court on September 12, 1978 approved a certificate granting the bank a first priority claim and security interest in all unencumbered assets of the bankrupt as permitted by § 344 of the Act. The loans were made in four installments, the first being made on September 13, 1978, and the last on December 8, 1978. Continental made its first actual disbursements on the payment bond on November 10, 1978, in an aggregate amount exceeding $30,000. The surety eventually paid over $75,000 to laborers and materialmen on the bond.

Despite the influx of new capital, the bankrupt's troubles continued. When the time for repayment of the loan arrived, Pangori was unable to pay the balance due. In an attempt to stave off the bank's demands for payment, the receiver agreed to assign to the bank all proceeds due from the Sterling Heights project; at that time the bankrupt was involved in two lawsuits with the city regarding the project. On January 9, 1980, the Court approved this assignment pursuant to another *ex parte* motion by the receiver.

On September 19, 1980—nine months after the order assigning proceeds was entered—the surety moved to vacate this order. Consideration of this motion was held in abeyance pending the outcome of the state court litigation between the bankrupt and the city, since if the bankrupt was unsuccessful, the controversy might be mooted. While this particular matter was dormant, on April 2, 1982, the case was converted to a straight bankruptcy; on April 5, 1982 the operating receiver was appointed as trustee. The trustee and the city finally reached a settlement whereby the latter agreed to pay Pangori $30,000 in satisfaction of all claims arising out of the sewer project. On June 26, 1984, the Court ordered Sterling Heights to pay this sum to the trustee, who was directed to keep the money separate from all other funds until the Court determined the respective rights and priorities of the parties to the proceeds. There the money sits awaiting distribution.

Continental claims that by virtue of its liabilities incurred on the payment bond, its rights in the proceeds of the sewer project are superior to both the trustee and the bank. The surety asserts that it became subrogated to the rights of the materialmen and laborers, the bankrupt and the city; it further claims that because the right of subrogation relates back to the date of execution of the bonds (March 21, 1977), its interest in the retained funds attached well before the petition in bankruptcy was filed, and is therefore superior to the rights of the trustee and his assignee. Additionally, Continental claims that the proceeds were assigned to it pursuant to the contract of indemnity and that this assignment was not governed by the filing requirements of the Uniform Commercial Code. In essence, Continental takes the position that the proceeds never became part of the bankruptcy estate, or, if they did, they came into the estate subject to the surety's valid prior lien. In either case the trustee would have been without authority to assign the receipts from the sewer project to the bank. Michigan National Bank, of course, contests the surety's several claims and states that Continental has no enforceable property interest in the funds, it being at best an unsecured creditor, inferior in priority to the trustee. The Bank's rights are entirely derivative of the trustee's.

## II. DISCUSSION

### A. RELIANCE ON PRIOR COURT ORDERS

■ The bank reminds us that the Court entered two orders, the first authorizing the receiver to pledge the bankrupt's accounts receivable as security for the bank's $35,000 loan, and the second directing the disbursement of the contract proceeds to the bank upon their receipt. It claims that: "Michigan National Bank reasonably relied upon the integrity of the Bankruptcy Judge's orders. Those orders should not be lightly discarded *ex post facto* and in the absence of compelling authority or logic supporting such a betrayal."

What the bank "relied" on were *ex parte* orders entered on the basis of, at best, *ex parte* petitions or, at worst no petition at all. Careful review of the records of this case reveal that no petition for the issuance of a receiver's certificate was ever filed with the Court; although the order of September 12, 1978 refers to an "attached petition", it appears neither there nor anywhere else in the file. No notices of either the requests for orders or of the entry of the orders were served on Continental, even though the bank and the receiver must have known that there were outstanding payment and performance bonds on the project, as the bankrupt was engaged in a Michigan public works project. Whether or not notice to the list of creditors was necessary, due process of law required that one seeking to subordinate another's lien serve the other with the request for such relief. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Halvorsen v. Grain Dealers Mut. Ins. Co.*, 210 F.Supp. 73 (W.D.Mich.1962). This Court abhors the practice of obtaining court authorizations and orders without the decency of providing the parties necessarily interested in the result with notice of the request and an opportunity to be heard thereon. Such are the rudiments of due process. Such conduct invites disrespect for the judicial system, promotes the appearance of cronyism, and, since in the final analysis the result of such practice will likely be overturned anyway, creates gross inefficiencies in the administration of justice. The bank relied on something that was written in invisible ink and should have known it.

Moreover, the order resulting from the receiver's phantom petition for authority to issue receiver's certificates, upon which Michigan National Bank "relies", does not in fact authorize the receiver to issue certificates which would prime an otherwise prior lien. While the order does give the holders of certificates priority of payment over other creditors, the certificate "shall constitute a first lien on all *unencumbered* assets of the estate and a *subordinate lien* and encumbrance on any and all encumbered assets of the estate." (Emphasis added). In other words, the order gives the receiver no authority to upset pre-existing liens on the bankrupt's property. The order ultimately neither heightens nor diminishes the bank's rights to the funds; as the following discussion indicates, the controlling question is not whether the *ex parte* orders gave the bank a priority claim, but is instead whether Continental had an enforceable lien on the date the bankrupt filed its petition for an arrangement. For these reasons, the Court will place no weight at all on the existence of its prior orders, despite the bank's alleged "reliance" on them.

## B. SUBROGATION, INDEMNITY AND REIMBURSEMENT, GENERALLY

Generally speaking, the surety's rights of "subrogation" in fact encompass several distinct rights, which are more precisely referred to as the rights of indemnity and reimbursement as well as subrogation. The right of indemnification may arise from the express contractual relation between the parties, implied contract, or by operation of law, *Green Constr. Co. v. Williams Form Engineering*, 506 F.Supp. 173, 178 (W.D.Mich.1980); it involves the promise of the indemnitor (here, Pangori) to compensate the indemnitee (Continental) for the latter's losses suffered on the former's behalf. Where, as here, an express contract does exist, it will be interpreted in accordance with the general rules of contract construction so as to fully effectuate the intention of the parties. *Liberty Mutual Ins. Co. v. Curtis Noll Corp.*, 112 Mich. App. 182, 315 N.W.2d 890 (1982); *Pritts v. J.I. Case Co.*, 108 Mich.App. 22, 310 N.W.2d 261 (1981).

In contradistinction to indemnity, subrogation, while it may be the subject of express contract, is, for the purposes of this discussion, a creature of equity, developed by courts for the benefit of the surety. The right of subrogation arises when the surety becomes obligated to satisfy the debts of its principal. Upon payment to

the principal's creditor, there is an equitable assignment to the surety of all the rights which that creditor could assert against the principal. *Simpson, Suretyship,* § 47 (West, 1950). The surety thus stands in the shoes of that particular creditor and may utilize any remedy against the principal which the creditor could have used. *American States Ins. Co. v. Taubman Co.,* 352 F.Supp. 197 (E.D.Mich.1972).

■ Reimbursement, too, is an equitable right implied in law in favor of the surety against the principal. The primary material distinction between subrogation and reimbursement is that, whereas subrogation permits a surety to enforce rights which derive from third persons, the right of reimbursement is a promise implied directly from the principal in favor of the surety. *Simpson, Suretyship,* § 48. Although both subrogation and reimbursement are rights which are said to arise at the time the surety becomes obligated to pay debts on behalf of the principal, neither ripens into an enforceable cause of action until the surety is actually called upon to satisfy a claim. 10 Appleman, *Insurance Law & Practice,* § 6509; 74 *Am.Jur.2d Suretyship,* § 171. In the present case, Continental claims entitlement to the proceeds on all of these theories.

## C. APPLICABILITY OF THE MICHIGAN UNIFORM COMMERCIAL CODE

■ Paragraph seven of the indemnity agreement provides that:

The Indemnitors [V. Pangori & Sons, Inc. and Vincent and Lorraine Pangori, individually] hereby assign, transfer and set over to the Company [Continental] (to be effective as of the date of such bond or bonds, but only in the event of default as aforesaid) all of their rights under the contract(s), including ... any and all sums due under the contract(s) at the time of such default, or which thereafter become due ...

The bank argues that this paragraph was a security agreement and that the assignment of collateral constitutes the granting of a security interest—that is, an interest in personal property or contract rights securing payment or performance of an obligation, Mich.Comp.Laws § 440.1201(37); Mich.Stat.Ann. § 19.1201(37)—in the contract with the city and the proceeds thereof. Since the surety failed to perfect this interest by filing a financing statement, as required by Mich.Comp.Laws § 440.9302(1); Mich.Stat.Ann. § 19.9302, the bank claims that Continental's security interest is unperfected and therefore subordinate to the rights of the trustee as a judicial lien creditor by virtue of § 70(c) of the Bankruptcy Act [11 U.S.C. § 110(c), repealed] and Mich. Comp.Laws § 440.9312(5); Mich.Stat.Ann. § 19.9312(5).

The surety counters that Pangori's assignment of the contract rights was not governed by the Uniform Commercial Code. Mich.Comp.Laws § 440.9104; Mich. Stat.Ann. § 19.9104 supports this argument. In relevant part, this provision states that Article 9 does not apply:

(f) to a sale of accounts, contract rights or chattel paper as part of a sale of the business out of which they arose, or an assignment of accounts, contract rights, or chattel paper which is for the purpose of collection only, *or a transfer of a contract right to an assignee who is also to do the performance under the contract.*

(Emphasis added). The Official U.C.C. Comments indicate that this section was intended to exempt transfers in contract rights "which have nothing to do with commercial financing transactions," from the operation of the Uniform Commercial Code. Although no Michigan case has directly considered whether § 9–104(f) excepts indemnity agreements arising out of the surety relationship from the operation of Article 9, the issue has been considered, at least in *dicta,* by other courts. The majority view is that indemnity agreements are outside the scope of the U.C.C. *See, e.g. In re J.V. Gleason Co.,* 452 F.2d 1219 (8th Cir.1971); *Alaska State Bank v. General Ins. Co. of America,* 579 P.2d 1362, 23 U.C.C.Rep. 466 (Alaska, 1978); *Canter v.*

*Schlager,* 358 Mass. 789, 267 N.E.2d 492, 8 U.C.C.Rep. 932 (1971). *But see In re Kuhn Constr. Co.,* 11 B.R. 746 (Bankr.S.D. W.Va.1981). In *Gleason,* the Eighth Circuit Court of Appeals discussed the nature of the relationship between surety and principal:

> A suretyship undertaking is not a true financing arrangement or security interest as those conceptual phrases are ordinarily and commonly used. There is no financing in the usual sense but rather a type of insurance running to the owner that insures the contractor's performance in case of default. No funds are advanced at the time of the suretyship contract.

*In re J.V. Gleason Co., supra,* at 1223–24. Thus, even though the funds retained by the city represent "accounts" as that term is defined by Mich.Comp.Laws § 440.9106; Mich.Stat.Ann. § 19.9106,[1] the assignment does not create a security interest in contract rights or accounts of the sort intended to come within the purview of Article 9.[2] Accordingly, we hold that Continental is not precluded from asserting its rights deriving from the agreement of indemnity because even though it did not take the steps necessary to perfect an Article 9 security interest, it did not need to do so.

■ Likewise, we hold that the surety's rights of equitable subrogation and reimbursement do not come within the purview of the Uniform Commercial Code. Rights of subrogation and reimbursement, "although growing out of a contractual setting and ofttimes articulated by a contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. Therefore, subrogation rights are not 'security interests' within the meaning of Article 9." *Canter v. Schlager, supra,* 267 N.E.2d 492, 8 U.C.C. Rep. 932, 935; *American Oil Co. v. L.A. Davidson, Inc.,* 95 Mich.App. 358, 290 N.W.2d 144 (1980); *see also Jacobs v. Northeastern Corp.,* 416 Pa. 417, 206 A.2d 49, 2 U.C.C.Rep. 348 (1965).

### D. CONTINENTAL'S RIGHTS OF INDEMNIFICATION AND SUBROGATION

In claiming entitlement to the proceeds, Continental relies heavily upon the case of *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). That case involved a federal construction contract governed by the Miller Act, 40 U.S.C. § 270a, *et seq.,* wherein the contractor was required to procure performance and payment bonds for the benefit of the United States and the laborers and materialmen, respectively. The contract authorized the government to retain a portion of the progress payments until final acceptance and payment of all creditors. Due to financial troubles, the contractor was unable to complete the project and the government terminated the contract. Although the United States eventually completed the project itself without resorting to advances on the performance bond, the unpaid subcontractors and suppliers did make demand on the surety's payment bond. The surety paid approximately $350,000 to these creditors before the contractor filed its petition in bankruptcy.[3] The government, which had been holding a retainage of $57,000 on the project, turned

---

1. This statute states that:

 Account means any right to payment for ... services rendered which is not evidenced by chattel paper whether or not it has been earned by performance.

2. While the assignment effectuated by the indemnity contract may fall broadly within the description in Mich.Comp.Laws § 440.9102(a), Mich.Stat.Ann. § 19.9102(a), it is more expressly excluded by § 9104(f). When interpreting the meaning of a statute, the provision which more specifically addresses an issue should be given greater weight. *Bannan v. City of Saginaw,* 120 Mich.App. 307, 319, 328 N.W.2d 35 (1982).

3. It is not readily apparent from the Supreme Court's opinion when the payments on the performance bond were made. However, the opinion of the Court of Appeals indicates that the surety paid the materialmen and laborers in the spring and summer of 1956, and the bankruptcy was not filed until August of that year. *In re Dutcher Construction Corp.,* 298 F.2d 655, 656 (2d Cir.1962).

this fund over to the bankruptcy trustee. The surety then brought a suit to recover the fund on the grounds that its rights of subrogation gave it title superior to that of the trustee.

The Court agreed with the surety and ordered the turnover of the retainage. It began its analysis by noting that the trustee's rights in property of the bankrupt were no greater than the bankrupt's rights and any prior property interest of others had to be honored. Since nothing in the Miller Act or any other statute explicitly granted the surety a property interest in the retainage, the Court analyzed previous decisions which discussed the extent of the surety's rights of equitable subrogation. Based on these decisions, it concluded that the surety was equitably subrogated to the rights of both the government and the subcontractors; moreover, it held that these rights gave the surety property rights in the retained funds superior to a trustee in bankruptcy of its principal. The Court thus summarized the equities of the parties:

> We therefore hold ... that the government had a right to use the retained fund to pay laborers and materialmen; that the laborers and materialmen had a right to be paid out of the fund; that the contractor, had he completed his job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety having paid laborers and materialmen is entitled to the benefit of all these rights to the extent necessary to reimburse it.

*Id.,* 371 U.S. at 141, 83 S.Ct. at 237. The retainage was thus awarded to the surety.

■ It is Continental's position that the principles enunciated in *Pearlman* control the instant dispute and compel a ruling in its favor. At first blush, the facts here bear a strong resemblance to those of that case. Both involve a public construction contract upon which the surety was forced to satisfy claims of subcontractors under a payment bond; the Michigan Public Contractors Bond Act in large part parallels the Miller Act; the parties are fighting over the rights to a fund retained by the government after losses were incurred by the surety;[4] and the matter is essentially controlled by evaluating the relative rights of the surety and the trustee. There are, however, two key differences which distinguish this matter from the facts of *Pearlman* and necessitate an independent analysis of Continental's various claims to the retainage. First, Continental was not obligated to pay, and in fact did not pay any money to the laborers and materialmen until after Pangori filed its bankruptcy petition. Second, the rights of the several parties in the transaction are governed not by the Miller Act and federal common law interpretations of surety's rights, but by the Michigan Public Contractors Bond Act, decisions by Michigan courts interpreting that statute and this state's principles of indemnity, subrogation and reimbursement. Evaluation of property interests and security interests are matters of state law, and bankruptcy courts must therefore analyze the rights of the parties with reference to the laws applicable in that state. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); *In re Madeline Marie Nursing Homes,* 694 F.2d 433 (6th Cir. 1982); *In re Owens,* 27 B.R. 946, 10 B.C.D. 444 (Bankr.E.D.Mich.1983). The various subrogation rights by which Continental claims the proceeds are all determined by the laws of this state; thus, the majority of cases cited in the parties' briefs are of limited use as to this issue.

A major element—indeed, the cornerstone—of Continental's argument is the

---

4. In *Pearlman,* the United States was authorized to retain a percentage of the payments to the contractor by express language in the contract hiring the bankrupt. In the present case there was apparently no express contractual formula by which Sterling Heights withheld payments to Pangori; evidently it refused to tender full payment because it was generally unsatisfied with the bankrupt's performance. For the purposes of this determination, it makes no difference whether the funds were retained on the basis of express or implied contractual rights; either way, the retainage represents a fund which was due, at least initially, to the bankrupt in compensation for its performance of the sewer project.

doctrine that subrogation rights are generally held to relate back to the date that the bonds were executed. It asserts that notwithstanding the intervening fact of its principal's bankruptcy, any payments made after the petition was filed nonetheless give the surety a pre-petition lien on the proceeds. There is support for this proposition, *see* Simpson, *Suretyship*, § 47, p. 212; *Western Cas. & Sur. Co. v. Brooks*, 362 F.2d 486 (4th Cir.1966), and insofar as the trustee assumes the rights and is subject to the liabilities of the bankrupt, it is a sound argument. Were the doctrine of relation back applicable without restriction, we might be persuaded to award the retainage to Continental; such a determination, however, would be inconsistent with Michigan law.

We find that a recent decision by the Michigan Court of Appeals controls the outcome of this case, since it establishes both the standards for determining when there has been a default on the payment bond and the relative priorities between a surety and a judicial lien creditor. In *Earl Dubey & Sons, Inc. v. Macomb Contracting Corp.*, 97 Mich.App. 553, 296 N.W.2d 582 (1980). There, the plaintiff had received a judgment against the defendant, Macomb, pursuant to a breach of contract action. Macomb was the prime contractor for construction of the Southfield Freeway. To collect on its judgment, the plaintiff served a writ of garnishment on the State of Michigan, which disclosed an indebtedness of $110,010.74. Approximately three weeks later the defendant defaulted on the freeway project and the surety was forced to complete construction. The plaintiff, the defendant's surety, and the defendant's primary secured creditor all claimed to have priority to the garnished funds: the plaintiff because it was a judicial lien creditor; the surety because of its rights of indemnification and subrogation; and the bank by virtue of its perfected security interest in the account. The state deposited the proceeds with the court pending resolution of the dispute.

The Court of Appeals resolved the matter by examining the rights of the parties to the funds as of the date the writ of garnishment issued. It first addressed the rights of the parties on the assumption that the formal notice of default, executed subsequent to the garnishment, was the actual date of default. Under those circumstances, the court concluded that the surety "had no contractual rights to the funds ... because, as of the date of plaintiff's writ of garnishment, [the surety] was not obligated to perform under its surety contract." *Id.*, 97 Mich.App. at 559, 296 N.W.2d 582. The contractual assignment under which the surety claimed priority was virtually identical with the one in the case at bar. Similarly, the surety's subrogation rights to the funds were determined by the state of affairs on the date of the garnishment: if the surety had been obligated to pay at that time, it would have a superior claim to the funds; however, if there was no obligation when the garnishment issued, the surety could not invoke the doctrine of relation back to defeat the plaintiff. *Id.* In short, in Michigan, as long as the surety's liability is contingent and has not become an actual obligation triggered by its principal's default, its equitable rights may be subordinated to an intervening judicial lien creditor. Since the Michigan Supreme Court has not directly ruled on this issue, the opinion of the Court of Appeals in *Dubey & Sons* is the clearest expression by the courts of this state, and it should therefore be followed. *Wieczorek v. Volkswagenwerk, A.G.*, 731 F.2d 309 (6th Cir. 1984).

Moreover, the court entertained the surety's argument that even though the formal notice of default did not occur until after the garnishment, the contractor was in actual default prior to that time. The court agreed with the surety that, depending on the facts of the case, the contractor could be in actual default prior to the issuance of the garnishment and, if so, the surety had a valid claim to the funds. The court then discussed circumstances which would support a finding of actual default. Although the analysis is not exhaustive, the court's conclusion in *Dubey* may be summarized as

stating that two elements were necessary for the surety to prevail: first, it must show that there was an actual default prior to garnishment; second, it must show that it actually became obligated to pay. *Id.* 97 Mich.App. at 559–60, 296 N.W.2d 582. In the absence of proof to the contrary, such as actual payments or demand for payment on the bonds,[5] the formal notice of default would serve as the date on which the surety's obligation became choate. *Id.* at 561, 296 N.W.2d 582. Because there the surety could not prove any default by Macomb prior to the garnishment, the court found that there was no default until the formal notice.

■ When we apply *Dubey* to the facts of the instant case, it is clear that Continental's claim to the funds is subordinate to the trustee's. From the stipulated facts it appears Pangori was sufficiently delinquent in its payments to its material suppliers so as to at least technically give those suppliers claim under the bond.[6] However, while there may have been default,[7] there was no demand for payment prior to June 9, 1978. Thus, on the date that Pangori filed its petition in bankruptcy, Continental was not obligated to pay on the bond.

Since Continental was not obligated prepetition to perform under its payment bond, the trustee enjoys a position analogous to that of the plaintiff in *Dubey & Sons*, as § 70(c) of the Bankruptcy Act grants the trustee the status of a judicial lien creditor as of the date of the initial petition in bankruptcy. *U.S. v. Speers*, 382 U.S. 266, 86 S.Ct. 411, 15 L.Ed.2d 314 (1965); *In re Federal's, Inc.*, 553 F.2d 509 (6th Cir.1977).[8] It is important to note that

---

**5.** The court cited as an example *First Alabama Bank of Birmingham v. Hartford Accident & Indemnity Co., Inc.*, 430 F.Supp. 907 (N.D.Ala. 1977) wherein the contractor asked the surety to assume payments to subcontractors and suppliers. This was a demand for payment. Obviously, demand for payment from the subcontractors themselves would also support a finding of actual default.

**6.** With regard to enforceability, the bond incorporates the terms of Mich.Comp.Laws § 129.-207, Mich.Stat.Ann. § 5.2321(7), which states in relevant part as follows:

A claimant who has furnished labor or material in the prosecution of the work provided for in such contract in respect of which payment bond is furnished under the provisions of section 3, and who has not been paid in full therefor before the expiration of a period of 90 days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which claim is made, may sue on the payment bond for the amount, or the balance thereof, unpaid at the time of institution of the civil action, prosecute such action to final judgment for the sum justly due him and have execution thereon.

**7.** We note that the fact that Sterling Heights terminated the contract two days before Pangori filed bankruptcy is immaterial. First, Pangori disputed the facts giving rise to that action, and in fact was allowed to remain on the project pursuant to court order. Second, that default, if indeed it was a default, was on the performance bond, not the payment bond.

**8.** The bank obtained its rights from the receiver before he was transformed into a trustee. Sec-

tion 70(c) of the Bankruptcy Act of 1898, as amended [11 U.S.C. § 110(c), repealed], provides that the trustee shall have the rights and powers of a judicial lien creditor as of the date of bankruptcy. Although the statute does not explicitly grant the receiver the same powers, former Bankruptcy Rule 610 states that the "trustee *or receiver* may, with or without court approval, … prosecute any action or proceeding on behalf of the estate, before any tribunal." (Emphasis added). Former Bankruptcy Rule 11–57 makes this applicable to Chapter XI proceedings. Thus, "avoiding actions may be instituted by the receiver or trustee without court approval, as permitted by Rule 610." 13 *Collier on Bankruptcy*, ¶ 610.07, 6–120 (14th ed. 1979). Moreover, in the event of a conversion from a Chapter XI case to a liquidating bankruptcy, former Bankruptcy Rule 122 provides that "the case shall be deemed to have been commenced as of the date of the filing of the first petition initiating a case under the Act and shall be conducted as far as possible as if no petition commencing a chapter case had been filed." The key date for determining what property and rights the trustee acquired is therefore the date of the initial petition, not the date of his appointment. This includes situations where, as in the case at bar, the initial petition was filed under Chapter XI (resulting in appointment of a receiver), but the case was later converted to a straight bankruptcy. 4A *Collier on Bankruptcy*, ¶ 70.05, 66, n. 19 (14th ed. 1978). *See Wood v. Scott*, 180 F.2d 252 (6th Cir.1950). In other words, the trustee, in either of his capacities as receiver or trustee, could assert the avoiding powers of a judicial lien creditor from the date of the filing of the initial petition on June 9, 1978.

§ 70(c) does not determine what rights and priorities the trustee may assert. The interest of a lien creditor is a property interest and, thus "the extent of the trustee's rights, remedies and powers as a lien creditor are measured by the substantive law of the jurisdiction governing the property in question." 4B *Collier on Bankruptcy,* ¶ 70.49, 602–03 (14th ed. 1978). *Butner, supra.* Michigan law holds that a lien of a judicial lien creditor which attaches before a surety becomes obligated to perform under its bond is prior in right to the surety's claim. Thus, the rights of subrogation and indemnification are not permitted to relate back to the date of the initial suretyship agreement when a judicial lien intervenes. *Dubey, supra.* Accordingly, because Continental's claim to the proceeds by virtue of its contractual indemnity agreement is inferior to the rights of the trustee, it may thus be avoided. Additionally, we hold that, even though Continental is indeed subrogated to the rights of the laborers and materialmen it paid on behalf of Pangori, that right, too, arose only after the trustee's rights as a judicial lien creditor intervened and are, therefore, also subordinate to his rights.

## E. CONTINENTAL'S SUBROGATION TO THE RIGHTS OF THE CITY

Continental also claims to be subrogated to the rights of the government as owner of the project. Although the above analysis is broadly applicable to all of Continental's subrogation rights, regardless of from whom they are derived, this argument deserves further comment. It is well-established that the surety subrogates to the rights of only those creditors whom it pays on the principal's behalf. *Pearlman, supra; United States v. Munsey Trust Co,* 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); *American States Ins. Co. v. Taubman,* 352 F.Supp. 197 (E.D.Mich.1972). If Continental had been required to pay for completion of the sewer project from the *performance* bond, it would clearly be subrogated to the city's rights, since the performance bond is established for the benefit of the government. Mich.Comp.Laws § 129.202; Mich.Stat.Ann. § 5.2321(2).

However, Continental does not claim any subrogation rights based on the performance bond. Instead, it argues that upon Pangori's failure to pay its laborers and materialmen, the city had a right to withhold the contract payments for their payment; upon Continental's satisfaction of these claims through the payment bond, it became subrogated to the retainage. The underlying assertion is that the city might have retained funds to protect itself from liability to the unpaid subcontractors. In support, it again cites *Pearlman.*

There is, however, a considerable distinction between a right to withhold or apply proceeds to creditors of the contractor and a legal duty to do so. There is apparently no authority for the proposition that either the State of Michigan or its subdivisions has any obligation to ensure that materialmen and laborers on public construction projects are paid. Examination of recent Michigan cases indicate that laborers and materialmen have only one remedy other than direct action against the contractor—that being the right to seek satisfaction from the surety's payment bond. Mich.Comp.Laws § 129.203; Mich. Stat.Ann. § 5.2321(3) states that the payment bond is "solely for the protection of" laborers and materialmen; reimbursements from the payment bond are impliedly not for the benefit of the municipality. In *Reed & Noyce, Inc. v. Municipal Contractors, Inc.,* 106 Mich.App. 113, 308 N.W.2d 445 (1981), the Michigan Court of Appeals denied the subcontractor's request for imposition of a constructive trust or equitable lien upon retainages held by Clinton County. It intimated that, absent fraud, misrepresentation, mistake or similar circumstances, the plaintiff's recourse rested entirely with the statute. *Id.,* 106 Mich.App. at 120, 308 N.W.2d 445. The municipal entity is under no obligation to insure that the contractor procures performance or payment bonds and does not waive its immunity even when no bond is provided in violation of the statute. *William C. Reichenbach Co. v. State of Michigan,* 94 Mich.App. 323, 336, 288 N.W.2d 622 (1979). Since Conti-

nental's pay-out on the payment bonds did not go to creditors of the city, it is not subrogated to the rights of the city in the withheld funds.

## F. REIMBURSEMENT

 The principles set forth above with regard to Continental's rights of indemnification and equitable subrogation have equal force in determining when the surety's claim to reimbursement becomes enforceable. As noted above, courts will imply an obligation running directly from the principal to the surety. Just as with subrogation rights, however, the surety has no choate, enforceable right to reimbursement until it has actually fulfilled the obligation of the principal contractor. 74 *Am.Jur.2d, Suretyship,* § 171; Simpson, *Suretyship,* § 48. Since Continental made no payments prior to the commencement of this case, it did not have a claim against the bankrupt or a lien against any funds or proceeds due Pangori when the trustee's rights intervened. Essentially, the law in Michigan is that the equitable rights created by courts of equity to ameliorate losses to sureties bow to the rights of equally innocent intervening judicial lien creditors. This is in accord with the principle of equity jurisprudence that equitable remedies should not be invoked when doing so would injure innocent parties. 27 *Am.Jur.2d., Equity,* § 146, § 147, § 150, *but see* § 149.

Although the foregoing effectively decides the case in favor of Michigan National Bank, there is another, policy-based, reason why post-petition advances by the surety should not be allowed to relate back past the principal's filing a petition in bankruptcy. It has been observed that if a creditor were allowed to hold the principal liable for advances made after discharge in bankruptcy, the bankrupt would be deprived of the primary benefit of the Bankruptcy Act. Simpson, *Suretyship,* § 47, n. 74. Although this rationale has more traditionally been utilized with regard to reimbursement, it is equally applicable to subrogation and indemnity. When the principal seeks protection from its creditors in the bankruptcy court, it would be inconsistent with the purposes of the Bankruptcy Act to allow a surety, with knowledge of the principal's bankruptcy, to make post-petition payments to creditors thereby allowing it to obtain a higher position than the creditors it paid would have enjoyed. The proposition Continental urges, that the rights of equitable subrogation are absolutely unaffected by the intervening bankruptcy of the principal, is one that this Court is unwilling to adopt. It is inconsistent with the rationales underlying the equitable principles that gave rise to the doctrines of subrogation and reimbursement, and equally at odds with the purposes and goals of the Bankruptcy Act.

## G. MICHIGAN BUILDING CONTRACT FUND

 Finally, we note that the retainage was not held in a constructive trust for the benefit of laborers and materialmen, to which Continental might be subrogated. The Michigan Building Contract Fund Act, Mich.Comp.Laws § 570.151–153; Mich.Stat. Ann. § 26.331–333, provides that *payments made* by an owner to a contractor are deemed to be held in trust for the benefit of laborers and materialmen. Under the statute, payments made to the contractor are not its property; in the context of bankruptcy proceedings, the funds would not be part of the bankrupt contractor's estate. *Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979); *B.F. Farnell Co. v. Monahan,* 377 Mich. 552, 141 N.W.2d 58 (1966). However, the act is inapplicable to the case at bar. As a threshold matter, Michigan courts have consistently held that the act applies only to private construction contracts. *In re Certified Question,* 411 Mich. 727, 311 N.W.2d 731 (1981); *National Bank of Detroit v. Eames & Brown, Inc.,* 396 Mich. 611, 242 N.W.2d 412 (1976); *Reed & Noyce, Inc. v. Municipal Contractors, Inc., supra; Dubey & Sons, supra.*[9]

9. The Sixth Circuit Court of Appeals has held that the act applies to both public and private contracts. *Parker v. Klochko Equipment Rental Co.,* 590 F.2d 649 (6th Cir.1979), *cert denied,* 444

Subcontractors on public contracts have the independent remedy provided by the public bonds required by Mich.Comp.Laws § 129.201–211; Mich.Stat.Ann. 5.1321(1)–(11); *cf. Reed & Noyce, Inc., supra,* 106 Mich.App. at 120, 308 N.W.2d 445. Even were we to hold that laborers and materialmen on municipal contracts might be protected by the Michigan Building Contract Fund Act, generally, that holding would not further Continental's cause on the facts of this case, since the city never paid the funds to the contractor, but to the trustee wearing the "hat" of the hypothetical lien creditor.

To briefly summarize the foregoing, Continental could theoretically have an enforceable interest in the proceeds of the suit between the bankrupt and the city pursuant to the general indemnity agreement, on the basis of equitable subrogation to the rights of the laborers and materialmen or the government, or by virtue of its equitable right of reimbursement against the principal. Had it prevailed on any of these claims, it would have proven its entitlement to the proceeds. However, none of its several rights gives it priority over the trustee, and since the rights are independent rather than cumulative, Continental's claim to the proceeds fails. On the facts of this case, it is not subrogated to the rights of the city because it incurred debt only on the payment bond, which is for the benefit of the laborers and payment does not satisfy any obligation of the city to the subcontractor. While it is subrogated to the rights of the laborers and materialmen whom it paid out of the payment bond, these advances were made—and equally important, the obligation to make those payments arose—subsequent to Pangori's petition for bankruptcy; consequently, Continental's right to the lawsuit proceeds is subordinate to the trustee's rights. The general rule that the surety may deem

its claims to "relate back" to the date the bonds were executed is terminated by the principal's bankruptcy petition. Continental's implied right to reimbursement falls short for the same reasons. Until payments were made on the bankrupt's behalf, the surety's claims were contingent and unenforceable; before any of those rights ripened into an enforceable lien, the trustee acquired the rights of a judicial lien creditor in the retainage held by the city.

This discussion has, by and large, compared the rights of the trustee with those of the surety, even though the most ardent advocate of the trustee's rights has been Michigan National Bank. The reason is simple enough. The trustee assigned whatever rights he had to the bank in order to buy time for the business; having done so, the trustee is little more than a stakeholder here. The bank, as assignee, is the real party in interest. The trustee, at the time of his appointment, took possession of all property of the bankrupt not encumbered by enforceable prior liens. One element of that property was the right to receive any and all contract payments due Pangori. At the time the trustee was appointed, and when he assigned the funds to Michigan National Bank, there were no enforceable liens against the funds superior to his own as a judicial lien creditor, and so the proceeds were his to assign for the benefit of the estate and its creditors. Nothing that occurred subsequent to the assignment can retroactively diminish the trustee's rights. Accordingly, the trustee is directed to turn over the proceeds of the lawsuit, plus accrued interest, to Michigan National Bank. Consequently, Continental's motion is DENIED.

U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40. Because of the conflict between that holding and state court opinions, the Michigan Supreme Court specifically agreed to determine the issue when it arose in a suit in the District Court for the Eastern District of Michigan. In *In re Certified Question,* 411 Mich. 727, 729, 311 N.W.2d 731 (1981), the court expressly reaffirmed prior state court holdings that the act applied only to private construction projects. When interpreting provisions of state law, it is more appropriate to rely on holdings of that state's highest court when it has spoken clearly on the issue, and we do so here. *Foster v. Caterpillar Tractor Co.,* 714 F.2d 654 (6th Cir.1983).