**ALGERNON BLAIR, INC.**

v.

**ATLANTIC STEEL PLACING COMPANY, Inc. et al., United States Fidelity and Guaranty Co., Party Defendant to Cross-Claim.**

Civ. A. No. 11502.

United State District Court
N. D. Georgia,
Atlanta Division.

Feb. 28, 1969.

Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for plaintiff.

Arthur K. Bolton, Atty. Gen. of Ga., Wm. L. Harper and M. E. Thompson, Jr., Asst. Attys. Gen., Atlanta, Ga., for the State and defendant Peyton Hawes.

Smith, Cohen, Ringel, Kohler, Martin & Lowe (Ralph H. Hicks) Atlanta, Ga., for Southern & McKinney Drilling.

Joseph J. Gaines, Athens, Ga., for H. A. Lott, Inc.

Haas, Holland, Freeman, Levison & Gibert J. Kurt Holland, Atlanta, Ga., for Florida Steel Corp.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for Transamerica Ins. Co.

Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., for the United States.

Jacobs, Jacobs & Meyers, Harris Jacobs, Atlanta, Ga., for Ironworkers Local Union No. 387.

Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., for United States Fidelity & Guaranty Co.

## ORDER

EDENFIELD, District Judge.

Atlantic Steel Placing Company, Inc. (Atlantic Steel), a steel erecting firm, negotiated four subcontracts with four separate general contractors for the erection of steel. Two were in the state of Virginia, one in West Virginia, and one in Georgia. The general contractor for the Georgia job was Algernon Blair, Inc. Atlantic Steel was required to post separate payment and performance bonds in connection with each of these contracts, and in order to induce Transamerica Insurance Company (Transamerica) to execute these bonds as surety, Atlantic Steel executed an indemnity agreement to Transamerica whereby it agreed to indemnify Transamerica for any amounts which Transamerica might have to pay by reason of default by Atlantic Steel. The indemnity agreement also included an assignment of all job proceeds.

All four of the jobs went into default. On the Georgia job, here in question, Algernon Blair, the general contractor, held retainage due to Atlantic Steel in the amount of $15,382.70. There being several claimants to the fund, Algernon Blair paid the retained funds into court and filed this interpleader so that the priority of the claimants might be determined. The United States holds a tax lien against Atlantic Steel in an amount far in excess of the total amount involved. It, of course, claims the entire fund. Transamerica also claims the entire fund, by reason of the facts hereinafter recited, and on the ground that under the Federal Tax Lien Act of 1966 (26 U.S.C.A. § 6323(c)), it is entitled to priority over the tax claim of the United States.

The facts giving rise to Transamerica's claim are as follows: On the Georgia job (Algernon Blair), from which the retainage came, all laborers and materialmen have been paid by agreement and from the funds in court, it being conceded that they are entitled to priority under Georgia Code §§ 67–1801 and 67–2002(3). However, there are claims (and there will be others) being made against Transamerica by laborers and materialmen under the bonds which it posted with respect to the other three jobs. Transamerica's claim, in brief, is that since the effect of its indemnity agreement was to tie all these jobs together, it has become subrogated to the rights of all laborers and materialmen, from whatever job, so that all of the claims from all the jobs are entitled to priority just as if their labor and material had been furnished under the Georgia contract.

The Federal Tax Lien Act of 1966 represents an attempt to modernize the

Federal Tax Lien Law so as to make it more equitable as respects certain sureties and to bring it more in line with the realities of contemporary business practices. In brief, it accords additional priority to certain claims of such sureties over federal tax liens, even though previously filed, where certain circumstances obtain. In order to bring a surety within the protection of the Act (26 U.S.C.A. § 6323(c)) so as to obtain these priorities over the Government, six things are required under the Act:

(1) The surety must have a "security interest" as defined in the section.

(2) The security interest must have come into existence after the tax lien filing.

(3) The security interest must be one which is protected under local law against a judgment lien, as of the time of the tax lien filing, out of an unsecured obligation.

(4) There must have been a written agreement entered into before the tax lien was filed.

(5) This written agreement must constitute "an obligatory disbursement agreement" as defined in § 6323(c) (4).

(6) The security interest must be in "qualified property" within the limitations contained in § 6323(c) (4) (B).

■ In this case it is beyond dispute that Transamerica qualifies with respect to four of these six requirements. Unfortunately for it, however, all six are necessary; and the court concludes that in a contest where six are required, four can equal no more than zero. The claim of Transamerica will therefore be denied.

The first requirement as to which Transamerica's position falls short is No. 5; that is, that *as to these funds* and *as to these claims* the written agree-ment must constitute an "obligatory disbursement agreement" as defined in subsection (c) (4) of the section.

In this regard, subsection (c) (4) (A) of the section defines an obligatory disbursement agreement as follows:

"(A) Definition. * * * The term 'obligatory disbursement agreement' means an agreement (entered into by a person in the course of his trade or business) to make disbursements, but such an agreement shall be treated as coming within the term *only to the extent of disbursements which are required to be made by reason of the intervention of the rights of a person other than the taxpayer.*" (Emphasis added.)

With further reference to the meaning of the phrase, the legislative history of the Act also refers to an obligatory disbursement agreement as "an agreement entered into by a person under which he is obliged to make disbursements because someone other than the taxpayer has relied on his assurance." 6 CCH Fed.Tax Rep. ¶ 5360, pp. 60, 131.

Here, as respects claimants from other jobs, Transamerica simply has no such agreement. On the contrary, the only obligatory disbursement agreement it ever had as to these funds was the payment and performance bond filed by Transamerica covering the Blair job. As to that job, "third persons" (laborers and materialmen on that job) had a right to rely on payment of their claims by Transamerica under this undertaking; *and if the claims of such laborers and materialmen (on the Blair job) had been paid by Transamerica or were outstanding against it,* Transamerica would, as to them, be squarely within the section. But there are no such Blair claims. In fact, as to such claims the Government has conceded and has paid them by consent. There remain, therefore, only the claims of other laborers on other contracts in other states under other bonds. Such laborers have no

"rights" under the Blair bond, nor under it are payments to them "required to be made" by Transamerica. On the contrary, as to the Blair contract and as to funds arising from it, such persons stand in no better position than general creditors or outright strangers. It follows that, as to such claims, Transamerica has no "obligatory disbursement agreement" and hence no priority.

Nor did the exaction by Transamerica of an overall indemnity agreement (as to all four jobs) from the taxpayer (Atlantic Steel) improve claimants' position in this regard. The taking of such indemnity agreement added nothing to the obligation of claimant under its "obligatory disbursement agreement" (i.e., its bond) on the Blair contract, so that, as regards the applicability of 26 U.S. C.A. § 6323, claimant is in no stronger position with the indemnity agreement than it would be without.

For the same reasons it is also clear that, as to such foreign claims, Transamerica also fails to meet the demand of requirement (3), *supra, i.e.,* that the claim (security interest) be such that, by subrogation, they would otherwise be "protected by local law". Transamerica states in this regard at page 12 of its brief, that:

> " * * * [B]y subrogation Transamerica steps into the shoes of those laborers and materialmen and assumes their role of first priority to the job proceeds. This priority of laborers and materialmen is established by Georgia Code Ann. §§ 67–1801 and 67–2002(3)."

If "those" laborers referred to were laborers on the Blair (Georgia) job, this contention would be eminently correct, but laborers on a foreign job under a separate contract and a separate bond are certainly not "protected" by the local law of Georgia and their claims are entitled to no priority in the disbursement of funds from a Georgia job. Downs v. Bedford, 39 Ga.App. 155, 146 S.E. 514 (1929); Thurman v. Kyle, 71 Ga. 628 (1883). In fact the parties so concede.

For all of these reasons the main claim of Transamerica is denied.

■ The same claimant asserts, however, that irrespective of the validity of its main claim of priority it is, in any event, entitled to be reimbursed out of the funds in court for its attorneys' fees and expenses incurred in litigating this interpleader action and in defending against certain Blair claimants under the Blair bond. The court knows of no authority whereby claimant could be reimbursed for its expenses in litigating this proceeding, and claimant cites none. Such claim is denied.

With respect to fees and expenses incurred in connection with its defense of claims under the Blair contract (as distinguished from those in other states), the court concludes that claimant is correct. Section 6323(e) of the Federal Tax Lien Act expressly recognizes that the priority of a claimant extends to such fees and expenses to the extent that, under the Act, the federal tax lien "is not valid". As to claimants under the Blair contract, the court has held and the Government has conceded that the tax lien "is not valid". It follows that, as to these items, Transamerica's claim is good. If the parties can stipulate the amount of such fees and expenses (excluding those incurred on other jobs), an order awarding them will be entered. Otherwise, the parties may request a hearing. The balance of the fund is awarded to the United States.