In re BAY STATE YORK COMPANY,
INC., Debtor.

Jeffrey A. KITAEFF, Chapter 7 Trustee of
Bay State York Company, Inc. and Jag-
er, Smith, Stetler & Arata, P.C., Plain-
tiffs,

v.

PEABODY CONSTRUCTION COMPANY,
INC., Hartford Casualty Insurance Com-
pany, and United States of America, De-
fendants.

Bankruptcy No. 91–10187–JNF.
Adv. No. 91–1759.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 23, 1993.

Bruce F. Smith, Boston, MA, and Jeffrey
A. Kitaeff, Andover, MA, for plaintiffs.

Peter G. Hermes, Boston, MA, for Hart-
ford Cas. Ins. Co.

George P. Eliopoulos, U.S. Dept. of Jus-
tice, Washington, DC, for I.R.S.

**MEMORANDUM**

JOAN N. FEENEY, Bankruptcy Judge.

I. INTRODUCTION

The matter before the Court is the "First
Amended Complaint for Turnover of Assets
and to Determine Priority of Liens" (the
"Complaint") filed by the Chapter 7 Trustee
of the estate of Bay State York Company,
Inc. ("BSY") and Jager, Smith, Stetler &
Arata, P.C. ("JSSA").[1] The original com-

---

1. Prior to the initiation of this adversary pro-
ceeding, the Trustee entered into an agreement
with JSSA which provides that for every dollar

collected by JSSA $0.25 will be paid to the Trust-
ee for the benefit of the estate. With respect to
the balance, $0.50 is to be applied toward the

plaint was filed on December 31, 1991. The amended complaint was filed on May 5, 1992. Following protracted discovery and a number of continuances granted at the request of the parties, this matter was tried on August 12, 1993. The Court now makes the following findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

## II. UNCONTESTED FACTS

This adversary proceeding arises out of a construction project known as "Harbor Point" (the "Project"). Harbor Point Apartments Company Limited Partnership was the Owner, Massachusetts Housing Finance Agency ("MHFA") was the lender, Vernon Construction Company ("Vernon"), a joint venture of CMJ Peninsula Construction, Inc. and Peabody Peninsula Construction Company, Inc., was the general contractor, and BSY was the heating, ventilation and air-conditioning ("HVAC") subcontractor for the Project pursuant to a Subcontract, dated September 29, 1986, and pursuant to certain change orders. The Subcontract, the value of which exceeded $11 million, specifically incorporated certain documents, including the "[c]ontract between the General Contractor and the Owner and any attachments, schedules, addenda, modifications and conditions thereto" and the Project Specifications. Upon executing the SubContract, BSY agreed to

> perform and complete this work in a thorough, workmanlike manner under the direction and to the satisfaction of the Contractor and to do all the work herein sublet in conformity with said Plans, Drawings and Specifications, including all labor and materials incidental thereto and to provide, at his own expense, all ladders, scaffolding, implements, apparatus, molds, models, hoisting, cartage, and any other machinery, equipment and tools necessary for the performance of the work or works herein sublet.

Subcontract, Article 1. BSY agreed that the Contractor could

reduction of JSSA's security interest and $0.25 is to be applied to JSSA's attorneys' fees for its collection efforts. On July 12, 1991, the late

withhold monies for a period of thirty (30) days *after the Subcontractor has fully completed the work and after the Contractor receives final payment from the Owner.* Said withholding may be applied by the Contractor toward any reasonable costs resulting from delay in performance or any deficiency or defect in the work of the Subcontractor or any failure of the Subcontractor to perform his obligations herein. The Subcontractor agrees that the Contractor may withhold from amounts due the Subcontractor the amounts of any lien claims or claims against the Contractor's bonds resulting from the Subcontractor's nonpayment of bills.... *The retainage will be reduced in an equal percentage as the retainage is reduced to the contractor.*

\* \* \* \* \* \*

No payment by the Contractor to the Subcontractor shall relieve the Subcontractor of responsibility for any work or materials not in accordance with this contract; and the Subcontractor shall remedy any defects in his work and pay for any damage to other work resulting therefrom.

Subcontract Article 4 (emphasis supplied). With respect to final payment, the Subcontract provided the following:

> The final payment after all adjustments provided for herein shall be made sixty-five (65) days after completion of the work covered by this Contract and acceptance thereof by the Contractor, the Architect in charge of said work for the Owner, and the Owner, provided:
>
> (a) close out requirements of the Specifications and the particular trade section covered by this Contract, General Conditions, the terms and conditions of this Contract and the requirements of any applicable affirmative action program have been met, and
>
> (b) the Subcontractor has given to the Contractor satisfactory evidence that the premises are free from all liens or other claims chargeable to the premises or the said Subcontractor, and....

Chief Bankruptcy Judge James N. Gabriel approved this arrangement.

(e) satisfaction by the Subcontractor and/or Contractor of any and all requirements of the Owner and Lender as conditions to the final payment of the Contractor for the work contemplated by this Contract. . . .

Subcontract Article 5. With respect to warranty work, BSY also agreed

(g) [to] provide and promptly pay for all materials, labor, tools, equipment, transportation and other facilities necessary for the execution and completion of the work as herein set forth. . . . [and]

(g) to warranty and represent that all materials and equipment furnished under this Contract will be new unless otherwise specified, and that all work will be of good quality, free from faults and defects and in conformance with the Contract and any contract documents in connection with the contract between the Owner and the Contractor, including but not limited to the Drawings, Plans and Specifications. All work not conforming with these requirements be considered defective [sic]. *If within one year after the date of substantial completion of the work or within such longer period of time as may be prescribed by law or by the terms of any applicable general or special warranty required by the contract documents between the Owner and Contractor, the Subcontractor shall correct such defect promptly upon written notice from the Contractor.*

Subcontract Article 7(g)–(h) (emphasis supplied). In Article 12 of the Subcontract, BSY agreed that

If the Contractor deems it inexpedient to correct work of the Subcontractor not performed in accordance with this contract, the Contractor may deduct the cost of performing the work from the contract price.

Subcontract Article 12. Alternatively, BSY agreed that it would

. . . within three (3) business days after receiving written notice from the Contractor, proceed to remedy and correct or, if ordered, to take down all portions of the work and remove from the premises all material, whether corrected or uncorrected, which the Contractor shall deem to be unsound or improper, or which has in any way failed to conform to the Drawings, Plans and Specifications. The Subcontractor at his own cost and expense shall make good any defects or omissions and all work damages or destroyed thereby redoing or replacing any such work in a manner and with materials satisfactory to the Contractor.

If the Subcontractor, being so ordered, does not proceed to correct or remove said defective work within twenty-four (24) hours, or fails to prosecute diligently said work of correction or removal, then the Contractor may correct the aforesaid defects or remove the defective work and store the material, all at the expense of the Subcontractor, and the Contractor may charge the cost of such correction or removal to the Subcontractor by deducting the same together with all loss, expense and damage arising therefrom from any amounts then and thereafter due to the Subcontractor, and if said amounts prove insufficient, may collect the deficiency from the Subcontractor.

Subcontract Article 13. Finally, the Subcontract contained provisions for termination in the event BSY failed to supply proper materials, failed to promptly pay bills incurred in connection with the work or failed to correct defective work or materials as or when ordered as follows:

. . . the Contractor may, after three (3) business days written notice to the Subcontractor, provide any labor, equipment and materials required and charge the same to the account of the Subcontractor together with all damages cost or expense occasioned to the Contractor or, at the option of the Contractor, may terminate forthwith the employment of the Subcontractor by mailing a written notice of termination and complete or sublet the work or any part thereof.

Subcontract, Article 9.

The Contract between Vernon and the Owner, provided that "[t]he Contractor shall correct any defects due to faulty materials or workmanship which appear within one year from the date of substantial completion. . . ."

On December 10, 1986, Hartford Casualty Insurance Company ("Hartford") issued a performance and a payment bond under which Hartford was the surety, BSY was the principal and Vernon was the obligee.

Between March 30, 1990 and May 29, 1990, over three years from the date the Subcontract was executed, representatives of C.A. Crowley Engineering, Inc., Vernon, MHFA, BSY, and the Project Architect, Russell & Scott, prepared and reviewed work on final punch list items for HVAC work. In June and July of 1990, Vernon submitted Applications and Certificates for Payment to MHFA (AIA Document G702), in which Vernon indicated that all mechanical work on the Harbor Point project was complete and no additional sums were needed to finish the work.

On November 13, 1990, over three months after Vernon submitted its final application for payment, Hartford received written notice from BSY that it was "unable to complete the work and/or pay its obligations to suppliers of labor and materials on contracts or subcontracts bonded by Hartford." BSY authorized Hartford to take action it deemed appropriate "to cause the bonded projects to be completed and to pay outstanding amounts to suppliers of labor and materials." However, Vernon never sent any form of written notice to BSY either demanding that defective work be corrected or terminating the Subcontract either before or after the November 13, 1990 letter.

Beginning in November of 1990 and continuing through May of 1991, Hartford paid $248,383.15 under the Harbor Point bonds to suppliers and workman or consultants with respect to incomplete or defective work performed by BSY.

Peabody Construction Company, Inc., as the successor to Vernon, paid in escrow to the Trustee $319,077.00, which sum represents the unpaid subcontract balance under the HVAC subcontract for the Project.

On August 15, 1990, JSSA and BSY entered into a security agreement. JSSA filed UCC–1 financing statements with the Secretary of State of the Commonwealth of Massachusetts on August 15, 1990 and with the City Clerk of the City of Boston on August 21, 1990.

The Internal Revenue Service (the "IRS") filed with the Clerk of the United States District Court for the District of Massachusetts three Notices of Federal Tax Lien against BSY. The first Notice of Tax Lien was filed on September 12, 1990 for $311,-486.09; the second on December 4, 1990 for $155,449.10 and the third on May 1, 1991 for $66,917.98. On March 26, 1990, June 11, 1990, September 17, 1990, and December 17, 1990, a delegate of the Secretary of the Treasury made assessments against and provided notice and demand for payment to BSY for unpaid taxes for the following respective quarters and in the following respective amounts: 4th quarter 1989, in the amount of $503,985.93; 1st quarter of 1990, in the amount of $493,555.16; 2nd quarter of 1990, in the amount of $366,975.71; and 3rd quarter of 1990, in the amount of $274,943.56. As of May 4, 1992, the balances due with respect to these assessments were $19,672.31, $411,-229.27, $100,029.54, and $85,396.06, respectively.

On December 17, 1990, the IRS served Peabody and/or Vernon with a Notice of Levy, directing Peabody and/or Vernon to pay to the IRS all property and rights to property of BSY in Peabody's and/or Vernon's possession.

### III. THE EVIDENCE

The principal factual issue dividing the IRS and Hartford is whether BSY materially defaulted on its Subcontract with Vernon. The evidence presented was conflicting. Hartford called five witnesses: Robert L. Tilton ("Tilton"), the President of Williamson Electric, a company that repairs and sells motors, pumps, and air compressors; Robert A. O'Connell (O'Connell"), a bond claims attorney for Hartford; Richard Donahue ("Donahue"), controller for Harrington Brothers, a sheet metal contractor that supplied materials to BSY; Frank R. Zito ("Zito"), a certified public accountant with Tobias Fleischman, Shapiro & Co., P.C., an accounting firm retained by Hartford to review BSY's books and records; and Anthony Branca ("Branca"), a construction consultant

with PI Associates, a firm retained by Hartford to evaluate bond claims. The IRS called three witness: Richard Fish ("Fish"), the sole shareholder of BSY at the time of the Harbor Point Project; Hugh Russell ("Russell"), President of Russell & Scott Architects, the Project Architect; and Thomas P. Shanley ("Shanley"), an employee of Peabody responsible for collecting all funds due from the owner under the contract.

Tilton testified that his firm was paid approximately $46,000[2] either directly by Hartford or through Harbor Point Apartments in May of 1991 to repair 44 so-called Taco pumps used for heating and air-conditioning in certain buildings at the Project site. Tilton testified that the pumps were not installed by BSY in accordance with the manufacturer's instructions. Specifically, he indicated that a certain stanchion was not in place, an omission that caused the components of the pump to be out of balance, which in turn caused excessive wear and tear on the seals and bearings.

O'Connell testified in part about the following stipulated payments made by Hartford:

| Date | Payee | Amount |
|---|---|---|
| 2/8/91 | Southern Air | 2,037.72 |
| 1/30/91 | Southern Air | 2,184.88 |
| 1/24/91 | Town Industrial Supply | 47.32 |
| 12/20/90 | Harrington Brothers | 31,666.62 |
| 11/13/90 | Harrington Brothers | 100,000.00 |
| 12/20/90 | Corwin & Corwin (J & M) | 15,000.00 |
| 3/21/91 | J & M Electrical Co. | 2,402.40 |
| 3/15/91 | PI Assoc. (C, G & V Mech.) | 180.00 |
| 3/13/91 | Wayside Storage Trailers | 2,420.48 |
| 3/11/91 | J & M Electrical Co. | 10,538.20 |
| 3/8/91 | Correct Flow | 2,400.00 |
| 2/25/91 | A & A Insulation | 33,145.50 |
| 5/21/90 | Williamson Electric | 34,283.71 |
| 5/21/91 | Harbor Point Apts. Co. | 12,076.32 |
| | | $248,383.15 |

In particular, O'Connell testified that Southern Air performed warranty work, that Harrington Brothers had substantial claims for sheet metal provided, that the amount paid to J & M Electrical Co. represented a negotiated settlement, that the payment to PI Associates was for repair work on the Taco pumps, that payments to Correct Flow, A & A Insulation and Wayside Storage Trailers

were all bond claims and that the balance of the money spent was for incomplete or corrective work done by Williamson Electric on the Taco Pumps. O'Connell also indicated that Vernon took responsibility for the work on the Taco pumps and that Hartford paid for the work. He stated: "It was part of the contract. It had to be done." Moreover, he indicated that Vernon would not release the subcontract balance unless Hartford paid for the work.

Hartford also introduced into evidence, though O'Connell, its General Indemnity Agreement (the "Indemnity Agreement") with BSY. The Indemnity Agreement provided in relevant part the following:

> In respect to any Bond issued on behalf of an Indemnitor, all Indemnitors assign, transfer and convey to the Surety:
>
> A. All rights of the Indemnitors in, arising from or related to such Bonds or any bonded or unbonded contracts or any extensions, modifications, alterations or additions thereto;
>
> B. All right, title and interest of the Indemnitors in and to (1) the work performed, (2) all supplies, tools, plant, machinery, equipment and materials on or near work sites or elsewhere, and (3) all materials purchased for or chargeable to the contract which may be in the process of manufacture, construction or transportation, or in storage anywhere.
>
> These assignments shall take effect with respect to each Bond as of its execution date, but only in the event of any of the following:
>
> (a) An Indemnitor's abandonment, forfeiture or breach of, or failure, refusal or inability to perform, a contract guaranteed by any Bond;
>
> (b) An Indemnitor's failure, refusal or inability to pay any bills or satisfy any debts incurred in connection with the performance of a contract guaranteed by any Bond;

---

**2.** The parties stipulated that the total was $46,-360.03.

(c) An Indemnitor's failure, refusal or inability to satisfy any condition of any Bond or to comply with any term or provision of this Agreement;

(d) An Indemnitor's failure to pay when due, any debt owed to the Surety;

(e) An Indemnitor's assignment for the benefit of creditors....;

In the event these assignments become operative, the Indemnitors authorize the Surety, at its sole discretion and to the extent it deems appropriate, but without any obligation on its part:

(i) To assert and pursue all of the assigned, transferred or conveyed rights, actions, causes of action, claims and demands;

(ii) To take possession of all or part of the work plus all associated supplies, tools, plant, machinery, equipment, materials, records, drawings and plans, and to arrange for the completion of such work, or to relet, or consent to the reletting or completion of, the contract secured by any Bond.

\* \* \* \* \* \*

If a Bond is executed in connection with the performance of any contract, the entire contract price shall be dedicated to the satisfaction of the conditions of the bonded ... [illegible] ... or any securities, warrants, checks or evidence of debt, plus any proceeds thereof, given under the bonded contract shall be impressed with a trust in the hands of the Indemnitors in favor of the Surety for the purpose of satisfying the conditions of the bonded contract and shall be used for no other purpose until such conditions have been fully satisfied.

Donahue, Harrington Brothers' controller, indicated that BSY was obliged to pay its invoice within 60 days and that BSY fell behind on its payments to Harrington Brothers close to the end of the Project. Hartford introduced a promissory note executed by Fish, as President of BSY in the amount of $749,718.14, which represented the total amount owed by BSY to Harrington Brothers on all projects. Exhibit A attached to the note indicated that BSY owed Harrington Brothers $156,366.67 for the Harbor Point Project, $154,495.34 of which was attributable to the retainage held by BSY with respect to the materials supplied by Harrington Brothers.

On cross-examination, Donahue indicated that Harrington Brothers billed a gross amount but did not expect to receive its retainage until the end of the job, although it attempted to obtain all or a portion of the retainage when the job was 50% complete.

Zito testified that he examined BSY's accounts payable and determined that BSY owed Harrington Brothers $131,666.62, which was attributable to the retainage. He also testified that the monies owed to A & A Insulation was attributable to retainage. Nevertheless, Zito indicated that the only way the retainage owed to BSY could be devoted to taxes would be if the retainages it owed its materialmen and suppliers went unpaid or were paid by Hartford.

Branca testified that he recommended a $7,000 settlement with respect to the work on the Taco pumps but that Vernon went ahead and unilaterally made the repairs. Moreover, he indicated that he represented to Hartford that the warranty period had expired. Moreover, he attributed the leaky seals on the Taco pumps to improper water treatment and bearings that were burning out due to improper maintenance.

Fish testified that he believed the warranty period on the project expired around November 1, 1990 and that BSY never received any default notices from Vernon. He added that no liens were filed by any of BSY's subcontractors or material suppliers against the Harbor Point property. Additionally, he testified that in his opinion BSY completed the Harbor Point project.

Russell, the Project Architect, testified that he was on the job site at least two or three times per week. He also testified that he was in every room where the Taco pumps were located and that, although he did not personally inspect the pumps, engineers actually checked to see that the pumps were properly installed. He also identified Contractor's Applications for Payment in which

Vernon indicated that 100% of the work on the mechanical areas, which would have included HVAC work, was complete. Russell testified that he reviewed and approved these documents, thereby authorizing the mortgagee, MHFA, to release funds, and that the Application he signed on July 23, 1990, was the last requisition that he signed because all punch list items had been completed and Vernon was entitled to its retainage.

The final witness, Shanley, testified that Harbor Point paid Vernon its retainage pursuant to the punch list requisitions in June and July of 1990. Specifically, Vernon received $1,784,438.00 on or around June 20, 1990 and $50,000.00 on or around August 3, 1990.

With respect to the evidence presented, the Court notes that BSY's letter to Hartford, in which it indicated its inability to continue in business, failed to mention the Harbor Point Project, thus permitting the inference that Hartford bonded BSY on several projects. O'Connell's testimony supports this conclusion. Although he indicated that he received numerous calls from Harrington Brothers with respect to BSY, he was unable to recall whether those calls related to Harbor Point or other projects prior to November 1990. The Court also notes that in a November 20, 1990 letter Hartford notified Vernon of BSY's inability to fulfill its obligations and advised Vernon of its willingness to meet for the purpose of "the identification and payment of claims which are outstanding on the bonded subcontract for the protection of Vernon with respect to any work as to which warranties are outstanding and for the reimbursement of the Hartford for the subcontract balance of amounts it has paid to claimants." However, prior to January of 1991, there was no evidence other than a letter dated January 8, 1991 to indicate specifically when Vernon first became concerned about the Taco pumps. Moreover, no materialmen or suppliers filed mechanic's liens.

From the evidence presented the following chronology can be constructed:

| Date | Event |
| --- | --- |
| 9/24/85 | Contract between Vernon and Harbor Point Apts. |
| 9/29/86 | Subcontract between Vernon and BSY |
| 12/10/86 | Payment and performance bonds issued by Hartford |
| 7/19/88 | Indemnity Agreement executed by Hartford and BSY |
| 3/30/90 | Final punch list |
| 6/13/90 | Application and Certificate for Payment signed by Vernon indicating all mechanical work had been completed |
| 6/20/90 | Vernon received the retainage covered by the 6/13/90 Certificate |
| 7/18/90 | Final Application and Certificate for Payment |
| 8/3/90 | Vernon received balance of the retainage—$50,000 |
| 8/15/90 | Security Agreement between JSSA and BSY |
| 8/21/90 | UCC filings—$238,612.24 in legal fees owed JSSA |
| 9/3/90 | Retainage arguably due BSY pursuant to Art. 4 |
| 9/12/93 | IRS Notice of Tax Lien—$311,486.09 |
| 10/7/90 | Retainage arguably due BSY pursuant to Art. 5 |
| 11/8/90 | UCC filings by Hartford re: Indemnity Agreement |
| 11/13/90 | Letter from BSY to Hartford re: inability to complete contracts and pay suppliers on bonded projects |
| 11/13/90 | $100,000 payment to Harrington Brothers by Hartford |
| 12/4/90 | IRS Notice of Tax Lien—$155,449.10 |
| 12/17/90 | IRS served Notice of Levy on Vernon and/or Peabody |
| 12/20/90 | Payments to Harrington Brothers and J & M Electrical |

## IV. THE POSITIONS OF THE PARTIES

### A. Did a Material Default Occur?

#### 1. Hartford's Arguments

If BSY defaulted in the performance of its Subcontract such that it had no rights in or to the retainage held by Vernon, the retainage could not be subject to an IRS lien. Accordingly, Hartford argues that it became subrogated to BSY's rights to the earned but unpaid contract balance as of the date of the bonds as a result of BSY's default on its payment and performance obligations.

With respect to the *payment* of suppliers, Hartford rejects any notion that BSY was entitled to defer payment of its suppliers until it was paid its retainage. Under the terms of BSY purchase orders to Harrington Brothers, BSY was required to make payments within 60 days. Hartford argues that in the absence of a specific contract provision permitting a general contractor (or subcontractor) to withhold payments to its subcontractors (or suppliers) because of the failure of the owner (or general contractor) to pay the contractor (or subcontractor), payment must be in accordance with the contract.

Hartford, noting that no Massachusetts case has enforced such a "pay when paid clause," relies upon *A.J. Wolfe Co. v. Baltimore Contractors, Inc.*, 355 Mass. 361, 244 N.E.2d 717 (1969), and *Canam Steel Corp. v. Bowdoin Constr. Corp.*, 34 Mass.App.Ct. 943, 613 N.E.2d 121 (1993). In both cases, the state courts indicated that a contract provision such as the one in *Wolfe* that required payment of the subcontractor within 10 days of the owners' monthly progress payment to the contractor was not a condition precedent to any payment by the contractor to the subcontractor and merely set the time of payment. The court stated the following:

> [i]n the absence of a clear provision that payment to the subcontractor is to be directly contingent upon the receipt by the general contractor of payment from the owner, such a provision should be viewed only as postponing payment by the general contractor for a reasonable time after requisition (and completion of the subcontractor's work mentioned in the requisition) so as to afford the general contractor an opportunity to obtain funds from the owner.

*Wolfe*, 355 Mass. at 365–66, 244 N.E.2d 717.

Hartford also argues that Article 7(g) of the Subcontract required BSY to pay suppliers promptly and that Article 7(i) required BSY "to pay all sales taxes for material incorporated and all other state, local and federal taxes...." Since BSY failed to pay its suppliers, particularly Harrington Brothers, and the IRS, Hartford argues that BSY breached its Subcontract.

With respect to BSY's *performance* obligations, Hartford rejects any notion that 1) Vernon did not consider BSY in breach; 2) Vernon failed to give BSY notice of breach; 3) the architect's certificate bars a claim for breach; and 4) the warranty period expired. Hartford points to the following: 1) the January 1991 meeting at which Vernon took the position that retainages would not be released until BSY's breach was cured; 2) the failure to discover the defective work until its involvement with the project; 3) the language in the Applications and Certifications for Payment which state that "[i]ssuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this contract;" and 4) the testimony of Tilton and Branca that the pumps were installed improperly.

Hartford insists that the remedies set forth in Article 7 of the Subcontract are cumulative and that pursuant to Article 7(n) any failure to assert a claim for breach of warranty in a timely manner does not operate to bar a claim for breach of contract. In Article 7(n), BSY agreed that "any omission by the Contractor to compel the Subcontractor to comply with any of the terms and conditions of this Contract shall not constitute a waiver of any of the terms and conditions of this Contract and shall not operate as a bar to the Contractor insisting at a later date that the terms and conditions be complied with." In Hartford's view, since the Taco pumps were installed improperly, the warranty period did not commence until the work was properly completed. Finally, Hartford insists that MHFA held back BSY's final payment until September 1991 so that the funds at issue only became available because Hartford made good on the owner's claims.[3]

---

3. Exhibit 8 is a letter from Shanley to a representative of Harbor Point in which he states the following:

> In December of 1990, Vernon Construction Company established an escrow account with Mass. Housing Finance Agency pending the resolution of outstanding legal actions involving Vernon subcontractors on the Harbor Point project. The retainage owed to Bay State York Co., Inc., in the amount of $319,077.00, was being held for several reasons including an IRS lien as well as the fact that

### 2. IRS's Arguments

The IRS maintains that the objective evidence establishes that BSY completed its work in accordance with the subcontract and paid its suppliers as required under the Subcontract. The IRS points to the following: 1) Vernon, Russell & Scott, and the Project's Owner certified in June of 1990 that BSY had completed its work; 2) pursuant to Article 4, Vernon was required to reduce BSY's retainage "in an equal percentage as the retainage is reduced to the contractor;" 3) on June 20, 1990, Vernon received $1,784,438, and on August 3, 1990, Vernon was paid the balance of its retainage of $50,000, so that pursuant to Article 4 of the Subcontract, BSY's rights to the retainage at issue arose; 4) there was no evidence that Vernon incurred any costs within 30 days of either June 20, 1990 or August 3, 1990 and there were no lien claims made against the Project.

### 3. The Trustee

The Trustee has adopted Hartford's position with respect to the issue of the default.

### B. The Legal Positions of the Parties

### 1. IRS

■ The IRS argues that section 6321 of the Federal Tax Lien Act, 26 U.S.C.A. §§ 6321–6327 (West 1989 & Supp.1993), gives the Government a lien for unpaid taxes on "all property and rights to property" of a taxpayer who neglects or refuses to pay his taxes after demand. 26 U.S.C. § 6321. The IRS also notes that this lien reaches every interest in property that a taxpayer may have, *U.S. v. National Bank of Commerce,* 472 U.S. 713, 720, 105 S.Ct. 2919, 2924, 86 L.Ed.2d 565 (1985), arises on the date of the assessment, and continues until the assessment is fully satisfied or becomes unenforceable. 26 U.S.C.A. § 6322. According to the IRS, if all the requirements of section 6323(c) are satisfied, a surety's security interest in the proceeds of a bonded contract, which

arises from a surety bond executed before a tax lien is filed against the contractor, will be protected against the tax lien even though the surety makes no disbursements to materialmen or others pursuant to its bond until after the tax lien was filed.

Section 6323(c) provides in relevant part:

(1) In general.—To the extent provided in this subsection, even though notice of a lien imposed by section 6321 has been filed, such lien shall not be valid with respect to a security interest which came into existence after tax lien filing but which—

(A) is in qualified property covered by the terms of a written agreement entered into before tax lien filing and constituting— ...

(iii) an obligatory disbursement agreement, and

(B) is protected under local law against a judgment lien arising, as of the time of tax lien filing, out of an unsecured obligation.

*Id.* § 6323(c). The Federal Tax Lien Act defines "obligatory disbursement agreement" as

an agreement (entered into by a person in the course of his trade or business) to make disbursements, but such an agreement shall be treated as coming within the term only to the extent of disbursements which are required to be made by reason of the intervention of the rights of a person other than the taxpayer.

*Id.* § 6323(c)(4)(A). The Act further provides that

the term "qualified property" shall be treated as also including the proceeds of the contract the performance of which was ensured, and ... if the contract the performance of which was ensured was a contract to construct or improve real property, to produce goods, or to furnish services, the term "qualified property" shall be

the Surety Company for Bay State York Co., Inc. was required under their Performance and Material Payment Bonds to both pay existing creditors of Bay State York Co., Inc. on the Harbor Point Project as well as to finish the warranty work which was part of Bay State York's subcontract with Vernon.

Accordingly, Hartford's assertion that the IRS repeatedly misrepresented the status of the retainage is unfounded. The mortgagee did not hold back the funds, rather Vernon did so by creating an escrow with MHFA in December of 1990.

treated as also including any tangible personal property used by the taxpayer in the performance of such ensured contract.

*Id.* § 6323(c)(4)(C)(i)–(ii).

Although the IRS does not dispute that Hartford's surety bonds qualify under the definition for an "obligatory disbursement agreement," it does dispute that BSY granted Hartford a "security interest" which came into existence after tax lien filing which is in "qualified property covered by the terms of a written agreement" and that such security interest "is protected under local law against a judgment lien arising, as of the time of the tax lien filing, out of an unsecured obligation." In short, the IRS maintains that because Hartford's interests to the funds at issue derive from its purported equitable right of subrogation and not from a contractual right to those funds acquired before the tax lien filing, it is not entitled to the superpriority afforded by section 6323(c)(1).

### 2. Hartford

Hartford argues that even if BSY had some "property rights" in the retainage held by Vernon, under federal law Hartford's claim to such money is entitled to priority over the IRS tax lien based upon the section 6323(c) of the Act and accompanying regulations. Hartford maintains that it acquired an interest in the retainage by contract, namely the surety bonds themselves and the Indemnity Agreement. It further maintains that the upon payment under the bonds it became subrogated to Vernon and BSY's rights in the contract balance. Finally, Hartford argues that, under Massachusetts law, its interest in the funds held by Vernon would be entitled to priority against a judgment lien arising, as of the time of the tax lien filing, out of an unsecured obligation. *Canter v. Schlager,* 358 Mass. 789, 794, 267 N.E.2d 492 (1971).

### V. DISCUSSION

 The priority of competing liens is determined by reference to federal law. However, whether the tax lien attaches depends upon state law questions of ownership. *U.S. v. National Bank of Commerce,* 472 U.S. at 722, 105 S.Ct. at 2925; *In re Dave Thomas Co., Inc.,* 51 B.R. 66, 68 (Bankr. W.D.Ky.1985).

 This Court is not persuaded that there was a material default in the contract between BSY and Vernon that divested BSY of any and all interest, contingent or otherwise, in the retainage prior to September 12, 1990 when the IRS filed its Notice of Levy. A material breach occurs when there is a breach of "an essential and inducing feature of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.,* 411 Mass. 451, 470, 583 N.E.2d 806 (1991); *Bucholz v. Green Bros. Co.,* 272 Mass. 49, 52, 172 N.E. 101 (1930). Except for the failure to pay Harrington Brothers its retainage (and the IRS), BSY had paid most if not all its material suppliers, and there were no liens against the project. Moreover, the deficiencies in BSY's performance obligations were *de minimis* in the context of an $11 million dollar subcontract before change orders (i.e., 1% of the total contract price). *See Hayeck Bldg. & Realty Co., Inc. v. Turcotte,* 361 Mass. 785, 789, 282 N.E.2d 907 (1972). *See also D. Federico Co., Inc. v. New Bedford Redev. Auth.,* 723 F.2d 122, 127 (1st Cir.1983).[4] Indeed, the total payments made by Hartford represent 2.24% of the total contract price excluding change orders. Thus, while the evidence established that BSY did in fact fail to all meet its payment and performance obligations, the Court finds that at the time of the Notice of Levy on September 12, 1990, BSY had rights to the retainage to which the IRS lien could attach. The Court finds that at no time prior to November 13, 1990 was there any notice given by or to BSY from its materialmen, suppliers (including Harrington Brothers) or

---

**4.** The court in *D. Federico Co.* stated the following:

> Under Mass.Gen.Laws ch. 30, § 39G, substantial completion shall mean 'either that the work required by the contract has been completed except for work having a contract price of less than one per cent of the then adjusted total contract price, or substantially all of the work has been completed and open to public use except for minor incomplete or unsatisfactory work items that do not materially impair the usefulness of the work required by the contract.

723 F.2d at 127.

from Vernon to indicate that it was in default on its contract with Vernon. On the contrary, the Project Architect certified that the job had been completed on June 13, 1990. Pursuant to either Article 4 or Article 5 of the contract, BSY had a claim to the retainage held by Vernon, particularly since Vernon failed to notify BSY of any defects with respect to warranty items prior to September 12, 1990 or to terminate the contract.[5]

"The general rule is that a party who has substantially complied with his contract is entitled to recover the contract price, with deductions for any defects or incompletions." *Stanley Consultants, Inc. v. H. Kalicak Constr. Co.*, 383 F.Supp. 315, 319 (E.D.Mo. 1974). *See also Andre v. Maguire*, 305 Mass. 515, 516, 26 N.E.2d 347 (1940); *Handy v. Bliss*, 204 Mass. 513, 518–19, 90 N.E. 864 (1910). In view of the Applications and Certificates of Payment prepared by the Project Architect, the Court finds that the Project and BSY's HVAC work was substantially completed as of September 12, 1990, particularly as there was no evidence or argument to suggest that Vernon mislead the Project Owner and MHFA to obtain the balance due it under its contract. Thus, pursuant to Articles 4 and 5 of BSY's subcontract with Vernon, this Court concludes that the IRS's lien could attach to BSY's rights to property, namely the retainage. *See* 26 U.S.C. § 6321 ("If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount ... shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.") *Cf. J.A. Wynne Co., Inc. v. R.D. Phillips Constr. Co., Inc.*, 641 F.2d 205, 209 (5th Cir.1981). As of September 12, 1990, Hartford had not paid any materialmen or suppliers and had not stepped in to correct the deficiencies in BSY's performance with respect to the Taco pumps. In short, Hartford was not obligated to pay prior to November 13, 1990. *See In re V. Pangori & Sons, Inc.*, 53 B.R. 711, 720 (Bankr.

E.D.Mich.1985). Accordingly, absent the provisions of section 6323, this Court is unable to conclude that Hartford's subrogation rights take priority over the IRS's lien with respect to the retainage.

■ The requirements for the priority of an obligatory disbursement agreement are set forth in section 6323(c). The court in *Algernon Blair, Inc. v. Atlantic Steel Placing Co., Inc.*, 297 F.Supp. 1340, 1342 (N.D.Ga.1969), summarized them as follows:

1) The surety must have a "security interest" as defined in this section.

2) The security interest must have come into existence after the tax lien filing.

3) The security interest must be one which is protected under local law from a judgment lien, as of the time of the tax lien filing, arising out of an unsecured obligation.

4) There must have been a written agreement entered into before the tax lien was filed.

5) This written agreement must constitute an "obligatory disbursement agreement" as defined in section 6323(c)(4).

6) The security interest must be in "qualified" property within the limitations contained in section 6323(c)(4)(B).

The IRS disputes only the first and third of these requirements.

The term "security interest" is defined in the Federal Tax Lien Act as follows:

any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability. A security interest exists at any time (A) if, at such time, the property is in existence and the interest has become protected under local law against a subsequent judgment lien arising out of an unsecured obligation, and (B) to the extent that, at such time, the holder has parted with money or money's worth.

5. The Court notes that there was no "pay when paid" clause in BSY's contract with Vernon. Accordingly, the cases cited by Hartford with respect to BSY's obligation to pay Harrington Brothers applies equally to Vernon's obligations to pay BSY. *See Wolfe*, 355 Mass. at 365–66, 244 N.E.2d 717. Furthermore, there was no evidence that Vernon notified BSY in writing of its decision to withhold the retainage for any stated reason prior to September 12, 1990 or even by November 13, 1990.

26 U.S.C. § 6323(h). BSY and Hartford executed payment and performance bonds and an Indemnity Agreement pursuant to which Hartford agreed to act as surety for the Harbor Point project and BSY agreed to assign its contract rights upon default to Hartford. "Suretyship is a contractual relation resulting from an agreement whereby one person, the surety, engages to be answerable for the debt, default, or miscarriage of another, the principal." 74 Am.Jur.2d *Suretyship* § 1 (1974). Despite this principle, the IRS argues that Hartford did not obtain an interest in the retainage by contract, but rather obtained whatever interest it has through equity. In short, the IRS draws a distinction between the contractual obligations flowing from the bonds and the Indemnity Agreement and Hartford's equitable subrogation rights with respect to the retainage, which the IRS maintains are not consensual. By creating a dichotomy between Hartford's legal and equitable rights, the IRS maintains that the Internal Revenue Code's definition of security interest has not been met, since only Hartford's equitable rights of subrogation with respect to the retainage are protected under local law against a subsequent judgment lien, not its contractual rights. This position, while not ignoring the existence of the Indemnity Agreement which provides for the assignment of BSY's contract rights, would require compliance with the Uniform Commercial Code to perfect those interests since legal and equitable rights are rendered mutually exclusive.

█ The Court finds that the position espoused by the IRS is overly technical and contrary to its owns regulations. With respect to the requirement that the property acquired be protected under local law against a subsequent judgment lien arising out of an unsecured obligation, the case of *Canter v. Schlager*, 358 Mass. 789, 267 N.E.2d 492 (1971), provides guidance under Massachusetts law.

In *Canter*, the bankruptcy trustee sued the owners of a construction project for monies owed under a written contract. The contractor, which was adjudicated a bankrupt prior to the completion of the project, obtained payment and performance bonds from a surety company, Maryland Casualty Company. Prior to the adjudication, the surety paid in excess of $60,000 to a subcontractor who had furnished labor and materials for the project, and the owners paid the balance of the contract price to the surety. When sued by the trustee, asserting the rights of the contractor for monies owed under the contract, the owners contended that payment to the surety discharged any obligation to the trustee. The court found for the owners, noting that the surety was the real party in interest who could stand in the shoes of "either (1) the contractor whose obligations are discharged, (2) the owners to whom it was bound, or (3) the subcontractors whom it paid." *Canter*, 358 Mass. at 794, 267 N.E.2d 492, citing, *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141, 83 S.Ct. 232, 237, 9 L.Ed.2d 190 (1962); *National Shawmut Bank v. New Amsterdam Casualty Co., Inc.*, 411 F.2d 843, 845 (1st Cir.1969). The *Canter* court stated the following:

> The surety makes an alternative claim, not resting on the assignment to it by the contractor, that it is subrogated to the rights of the contractor to the contract balance to the rights of the owners, and to the rights of the subcontractors it paid. Such claims are not superseded by the Uniform Commercial Code.... 'Of basic importance is the general rule of Section 9-102(2) that Article 9 "applies to security interest *created by contract.*" (Emphasis supplied.) Rights of subrogation, although growing out of a contractual setting and ofttimes articulated by the contract, do not depend for their existence on a grant in the contract, but are created by law to avoid injustice. Therefore, subrogation rights are not "security interests" within the meaning of Article 9.'

*Canter*, 358 Mass. at 791–92, 267 N.E.2d 492 (citations omitted). Likewise in the *New Amsterdam* case, the Court of Appeals for the First Circuit, in rejecting the applicability of the Uniform Commercial Code to a suretyship situation, observed the following:

> In this case the real security is not the assignment of accounts receivable—which could be, failing the completion of performance, set off by the [owner]—but the

eventual right to be in the shoes of the [owner] upon job completion. This is not "created by contract" but rather by the status, resulting from a contract, inhering in a surety, quite independently of the express terms of the contract.

411 F.2d at 846. Unlike the Uniform Commercial Code, which speaks of security interests "created by contract," section 6323(h) of the Federal Tax Lien Act speaks of security interests "acquired by contract." Although subrogation rights are not created by contract, as *Canter* makes plain, they may be acquired by contract. Therefore, Hartford's subrogation rights are not of necessity excluded from the definition of security interest as the IRS suggests. Additionally, Hartford's rights relate back to the date of the bonds and can defeat the IRS's position and that of a judgment lien holder whose lien arises out of an unsecured obligation as in the *Canter* case where the owners prevailed over the trustee because "the surety's right dates back to the date of the bond. . . . Hence the right of subrogation prevails over the rights of a lien creditor such as the trustee in bankruptcy." *Id.*, 358 Mass. at 795–96, 267 N.E.2d 492 (citations omitted).

The Court's decision is not at odds with the IRS's own interpretation of section 6323(c). The Code of Federal Regulations with respect to 26 U.S.C. § 6323(c) provides, as an example, the following:

On June 1, 1971, K is awarded a contract to construct an office building. At the same time, S, a surety company, agrees in writing to insure the performance of the contract. In addition, the agreement provides that in the event S must complete the job as the result of a default by K, S will be entitled to the proceeds of the contract. In addition, the agreement provides that S is to have a security interest in all property belonging to K. On December 1, 1971, prior to the completion of the building, K defaults. On the same date, under 301.6323(f)–1, a notice of lien is filed with respect to K's delinquent tax liability. S completes the building on June 1, 1972. Under local law S's security interest in the proceeds of the contract and S's security interest in the property of K are entitled to priority over a judgment lien arising December 1, 1971 (the date of tax lien

filing) out of an unsecured obligation. Because, for purposes of an obligatory disbursement agreement which is a surety agreement, the security interest may be in the proceeds of the insured contract, S's security interest in the proceeds of the contract has priority over the tax lien even though a notice of lien was filed before S's security interest arose. Furthermore, because the insured contract was a contract to construct real property, S's security interest in any of K's tangible personal property used in the performance of the contract also has priority over the tax lien.

26 C.F.R. § 301.6323(c)–3(d)(3) (1993). With respect to security interests, the Code of Federal Regulations further provides with respect to protection against a subsequent judgment lien the following:

For purposes of this paragraph, a security interest is deemed to be protected against a subsequent judgment lien on—

(A) The date on which all actions required under local law to establish the priority of a security interest against a judgment lien have been taken, or

(B) If later, the date on which all required actions are deemed effective, under local law, to establish the priority of the security interest against a judgment lien.

For purposes of this subdivision, the dates described in (A) and (B) or this subdivision (i) shall be determined without regard to any rule or principle of local law which permits the relation back of any requisite action to a date earlier than the date on which the action is actually performed. . . .

26 C.F.R. § 301.6323(h)–1 (1993). Though doing little to clarify the situation, since at first blush it appears to contradict subsection (c) of the statute, the Court finds that the relation back principle employed by the Court in *Canter* relates to the legal effect of the surety's actions rather than the actions themselves. This interpretation is consistent with the examples used in § 301.6323(h)–1 regarding mechanic's liens and negotiable instruments. Accordingly, subsection (h) does not require a finding that Hartford lacks a security interest.

Finally, the IRS cites the recent decision by the Court of Appeals for the Sixth Circuit in *Indiana Lumbermens Mut. Ins. Co., Inc.*

*v. Construction Alternatives, Inc. (In re Construction Alternatives, Inc.),* 2 F.3d 670 (6th Cir.1993). In that case, the court ruled that the surety, in order to take priority over a subsequently-arising judgment lien under local law, would have to perfect its security interest by filing financing statements in accordance with Ohio's version of the Uniform Commercial Code. 2 F.3d at 677–78. The Sixth Circuit case is distinguishable from the instant case in two key respects: 1) it dealt with progress payments rather than a retainage; and 2) Ohio law, unlike Massachusetts law, apparently does not protect sureties absent the filing of financing statements. 2 F.3d at 678. The decision is devoid of analysis on this point; this Court respectfully declines to follow it.

## VI. CONCLUSION

In accordance with the foregoing, the Court hereby enters judgment in favor of Hartford and JSSA and against the IRS. The Court determines that Hartford has a priority position with respect to the funds now held by the Trustee to the extent of $248,383.15 and that JSSA has a perfected security interest in the balance of $70,693.85.